WALGREEN CO., Plaintiff-Appellant-Petitioner,

v.

CITY OF MADISON, Defendant-Respondent.

Supreme Court

*No. 2006AP1859. Oral argument February 26, 2008.
—Decided July 8, 2008.*

2008 WI 80

(Also reported in 752 N.W.2d 687.)

For the plaintiff-appellant-petitioner there were briefs by *Don M. Millis, Reinhart Boerner Van Deuren S.C.,* Madison; *James H. Gilbert, James H. Gilbert Law Group PLLC,* Eden Prairie, Minn.; and *Robert A. Hill, Robert Hill & Associates,* Eden Prairie, Minn., and oral argument by *Robert A. Hill.*

For the defendant-respondent there was a brief and the cause was argued by *Larry W. O'Brien,* assistant city attorney, Madison.

An amicus curiae brief was filed by *Robert Horowitz* and *Stafford Rosenbaum LLP,* Madison, on behalf of Wisconsin Association of Assessing Officers, League of Wisconsin Municipalities, City of Brookfield, City of Cudahy, City of Eau Claire, City of Greenfield, City of Kenosha, City of Lake Geneva, City of Milwaukee, City of New Berlin, City of Oshkosh, and Village of Pleasant Prairie, and oral argument by *Robert Horowitz.*

An amicus curiae brief was filed by *David D. Wilmoth, Patricia Hintz* and *Quarles & Brady LLP,* Milwaukee, on behalf of the Wisconsin Merchants Federation, Inc, and oral argument by *David D. Wilmoth.*

¶ 1. LOUIS B. BUTLER, JR., J. Walgreen Co. (Walgreens) seeks review of a published court of appeals opinion[1] affirming a judgment of the Dane County Circuit Court, the Honorable Diane M. Nicks presiding.

---

[1] *Walgreen Co. v. City of Madison,* 2007 WI App 153, 303 Wis. 2d 620, 735 N.W.2d 543.

The judgment adopted assessments of two Walgreens stores located in Madison, Wisconsin, conducted by the City of Madison (City) for tax purposes. Walgreens challenged the assessments and sought a refund of taxes paid on the properties for 2003 and 2004, but the Madison Board of Review rejected its challenges. Walgreens filed a Wis. Stat. § 74.37(3)(d) (2005–06)[2] action, and the circuit court and court of appeals both upheld the City's assessments.

¶ 2. On review, we must determine whether a property tax assessment of retail property leased at above market rent values should be based on market rents (as Walgreens argues) or if such assessments should be based on the above market rent terms of Walgreens' actual leases (as the City argues). We are also asked to address whether the City violated the uniformity clause of the Wisconsin Constitution in its assessment of Walgreens' properties, and whether Walgreens was barred by Wis. Stat. § 70.47(7) from challenging the 2004 property tax assessments. Because the other issues in this case are dispositive, we do not reach the uniformity clause issue.

¶ 3. We conclude that the issue under Wis. Stat. § 70.47(7) regarding whether Walgreens was barred from challenging the 2004 tax assessments has been waived and is moot. As to the issue regarding the proper method of property tax assessment, we reaffirm the holding of *Flood v. Bd. of Review,* 153 Wis. 2d 428, 431, 451 N.W.2d 422 (1990), that Wis. Stat. § 70.32(1) "proscribes assessing real property in excess of market value." This holding is consistent with the nationally recognized principle that "[a] lease never increases the

---

[2] All subsequent references to the Wisconsin Statutes are to the 2005–06 version unless otherwise indicated.

market value of real property rights to the fee simple estate." Appraisal Institute, *The Appraisal of Real Estate* 473 (12th ed. 2001). We also affirm that § 70.32(1) requires adherence to the *Wisconsin Property Assessment Manual*[3] (the *Property Assessment Manual*) absent conflicting law. The Manual is consistent with both statutory and case law in this state requiring an income approach assessment of a leased retail property's fair market value of the fee simple interest to be based on market lease rates, not actual contract rates, as long as encumbrances to the property do not cause its leased fee value to fall below a market rate value. We conclude that the circuit court in this case failed to apply these well-established rules of property assessment. Therefore, we reverse the decision of the court of appeals and remand for further proceedings consistent with this opinion.

I

¶ 4. The following facts are taken from the findings and uncontested factual descriptions in the circuit court's June 26, 2006, decision in this case. Walgreens leases properties located at 2909 and 3710 East Washington Avenue in Madison, Wisconsin. In addition to lease payments, Walgreens is also responsible for paying the property taxes for those properties.

¶ 5. The lease for each of the properties is for a term of 60 years, terminable after 20 years. The lease for the 2909 East Washington property has a stated monthly rent as of June 2006 (the date of the circuit

---

[3] 1 Bureau of Assessment Practices, *Wisconsin Property Assessment Manual* (2007).

court's opinion) at $35,833.33. The lease for the 3710 East Washington property has a stated monthly rent of $29,987.

¶ 6. The properties were constructed by a developer at Walgreens' direction, pursuant to a uniform business model followed by Walgreens. Under that business model, Walgreens rents property rather than purchasing it, working with developers who find sites for Walgreens' stores at prime locations in heavily trafficked areas, buy out existing businesses located at the desired sites, purchase the property, and build and/or develop it with "super adequacies"[4] to suit Walgreens' needs. Walgreens' lease payments under this business model include compensation to the developer for all such financing, land acquisition, construction, development and financing costs, together with a profit margin. The parties do not dispute that the inclusion of such costs into the lease terms results in higher than market rate rental payments; as the circuit court described it, the rent in the Walgreens leases is "higher than normal" in part because "the developer is recovering his development costs on a building that contains the superadequacies demanded by Walgreen." Both of the East Washington properties were developed and their leases based on this business model.

---

[4] The *Property Assessment Manual* defines "super adequacy" as "[a] greater capacity or quality in the structure or one of its components than the prudent purchaser or owner would include or would pay for in the particular type of structure under current market conditions." *Property Assessment Manual* G-37. Walgreens presented testimony at trial that the super adequacies it requires of its property include improvements tailored to its needs, such as drive-through stations, specially designed fiber optics systems, and high ceilings.

¶ 7. The procedural history of this case begins with the City's 2003 and 2004 property tax assessments of the two properties. The City's assessment reports for the properties describe the "market value" of the 2909 East Washington property at $4,618,000 and the "market value" of the 3710 East Washington property at $3,860,000 for the years 2003 and 2004. The assessor's reports also contain former assessment values for 2003 that were revised to match the 2004 valuations, and describe the methodology followed in the assessments. Specifically, the appraisal report for each property describes rejecting the "cost approach" to valuation in favor of an "income approach" utilizing a "direct capitalization" method, based on actual income, but using market-based expense and vacancy estimates.

¶ 8. Walgreens attempted to appeal the 2003 assessments to the Madison Board of Review pursuant to Wis. Stat. § 70.47, but the Board sustained the assessments after informing Walgreens that it could not appear before the Board of Review to object to its assessment because Walgreens had failed to comply with Wis. Stat. § 70.47(7)(af)'s requirement that it provide necessary income and expense information requested by the assessor's office. As to the 2004 assessments, Walgreens appealed to the Board of Review, and appeared at a hearing held on September 9, 2004. The circuit court in this case described the hearing in terms of the Board sustaining the assessments after Walgreens "presented estimated valuations, but did not provide any evidence supporting its estimated valuations."

¶ 9. After unsuccessfully pursuing claims against the City for excessive assessments, Walgreens filed suit in the Dane County Circuit Court under Wis. Stat. § 74.37(3)(d) seeking a refund of $150,625.47 plus in-

167

terest and litigation expenses for the alleged excess taxes paid on the East Washington properties for 2003 and 2004.

¶ 10. At trial, Walgreens and the City presented conflicting appraisals of the properties' market values. As the circuit court described it, Walgreens' appraiser "appraised the fee simple interest in the two properties without consideration of the lease, while [the City's appraiser] appraised the leased fee interest."[5] The ap-

---

[5] The *Property Assessment Manual* explains that a fee simple is a type of freehold estate, or ownership interest in property:

> Fee Simple – With this type of estate the owner possesses all of the rights an individual can have in property. It is the fullest form of private ownership, restricted only by the governmental limitations previously described. This estate does not recognize any mortgage or lease on the property. This type of estate has no time limit on its existence, is inheritable, and freely transferable during the owner's life by gift or sale.

*Property Assessment Manual* 7–3. In contrast, a "leased fee" is defined by the manual as "[a] property held in fee with the right of use and occupancy conveyed by lease to others. A property consisting of the right to receive ground rentals over a period of time, plus the right of ultimate repossession at the termination of the lease." *Property Assessment Manual* G-32.

The court of appeals in this case critiqued the parties' use of the phrases "fee simple interest" and "leased fee interest" and concluded that "[w]ith minor exceptions, we see no need to employ such terms in the remainder of this opinion." *Walgreen,* 303 Wis. 2d 620, ¶ 15 n.5. We disagree that these terms are irrelevant but note that the parties' overemphasis of the terms and their differences distracts from the main issues in this case. As explained in a passage of *The Appraisal of Real Estate* cited by both parties and discussed in our analysis, *both* the fee simple and the leased fee interests are relevant in determining the value of leased property because the two should be com-

praisals presented by Walgreens described using all three primary appraisal approaches discussed in more detail in our analysis—the cost approach, sales comparison approach, and income approach—while placing the greatest emphasis on the latter two approaches. In contrast, the City appraisal used only sales comparison and income approaches for the 2909 East Washington property, while ultimately basing its assessment solely on numbers derived from its income approach analysis.[6] It used only an income approach for the 3710 East Washington property, after concluding there were no comparable property sales.

¶ 11. The income approach analyses of both Walgreens' and the City's appraisals acknowledged that the property at issue is income-producing real estate, the value of which should take into account the property's expected cash flow through a capitalization technique. However, the primary difference between the appraisal approaches of the parties is that the income approach

---

pared to determine whether there is a negative or positive leasehold value. Appraisal Institute, *The Appraisal of Real Estate* 81–82 (12th ed. 2001). Similarly, in a passage that is particularly pertinent for our analysis, the Property Assessment Manual explains that for purposes of valuing the fee simple interest of a leased property, "[i]f the contract rents are at market levels, the leased fee interest is the same as a fee simple interest. However, if the contract rents are below market levels, the leased fee interest is likely less than the fee simple interest in the property." *Property Assessment Manual* 9–12.

[6] It should be noted that although the parties apparently dispute whether or the extent to which the City's assessor based its appraisal of the 3710 property on sales of that property prior the 2003 and 2004 assessments, it seems evident from the record that at least the 1999 sale was taken into consideration, as the $4,268,500 sales price exactly matches the 2003 "current assessment" of the property's value in 2003.

analysis in Walgreens' appraisals analyzed the market rent, as opposed to the contract rent, while the City's appraisals specified that they were "[u]sing the actual income from the [Walgreens property] lease." As a result of their different methodologies, Walgreens' appraisals assessed the 2909 and 3710 properties as valued in 2003 at $1,980,000 and $1,790,000, respectively, and as valued in 2004 at $2,070,000 and $1,870,000, respectively, i.e., significantly lower than the previously described assessments by the City.

¶ 12. In a decision dated June 26, 2006, the circuit court ruled in favor of the City, issuing the following three conclusions of law:

> 1. Walgreen[s] has failed to comply with the procedures in Wis. Stat. § 70.47(a) and (ae) with regard to its claims for the 2004 assessments and is, therefore, barred by Wis. Stat. § 74.37(4)(a) from challenging such assessments.
>
> 2. Wis. Stat. § 70.32(1) requires the Court to take into account the actual lease terms for the two subject properties.
>
> 3. Walgreen[s] has not presented sufficient evidence of [a] Uniformity Clause violation.

¶ 13. Walgreens appealed. In an opinion issued on May 17, 2007, the court of appeals affirmed the circuit court's decision. *Walgreen Co. v. City of Madison,* 2007 WI App 153, ¶ 52, 303 Wis. 2d 620, 735 N.W.2d 543.

¶ 14. The court of appeals concluded that the circuit court and the City's assessor correctly relied on Walgreens' contract rents, rather than on market rent, in assessing the properties' full values. *Id.,* ¶ 46. The court of appeals disregarded Walgreens' characterization of its monthly payments under the lease as reflect-

ing reimbursement of the acquisition, development and financing costs and a profit margin for each store. *Id.*, ¶¶ 36–37. Instead, the court concluded that because the monthly payments are appended to the properties by the lease agreement, they are "rights and privileges appertaining thereto" within the Wis. Stat. § 70.03 definition of "real property"; they directly affect what the properties would sell for in an arm's length sale; and they therefore are the proper subjects of consideration in an appraisal. *Id.* The court also rejected Walgreens' assertions of comparable property evidence and disregarded Walgreens' argument that the court should have adhered to the *Property Assessment Manual. Id.*, ¶¶ 38–45. Finally, the court concluded that Walgreens had not established a uniformity clause violation. *Id.*, ¶ 49. The court of appeals declined to address whether the dismissal of Walgreens' 2004 assessment challenge should be affirmed on the grounds that Walgreens failed to comply with Wis. Stat. § 70.47(7); the court of appeals explained that the substantive issues regarding the 2003 assessments applied equally to the 2004 assessments. *Id.*, ¶ 10 n.2.

¶ 15. Walgreens filed a petition for review on June 18, 2007, and review was granted.

II

¶ 16. We review excessive tax assessment claims brought under Wis. Stat. § 74.37(3)(d) without regard to determinations made at earlier proceedings. *Nankin v. Village of Shorewood*, 2001 WI 92, ¶¶ 24–25, 245 Wis. 2d 86, 630 N.W.2d 141. In such cases, we review the circuit court record, not the record from the Board of Review. *Adams Outdoor Adver. Ltd. v. City of Madison*, 2006 WI 104, ¶ 24, 294 Wis. 2d 441, 717 N.W.2d 803.

¶ 17. Although the general level of deference accorded to property assessments is that this court, like a circuit court, gives a city's assessment presumptive weight, "the assessment is presumed correct only if the challenging party does not present significant contrary evidence." *Id.*, ¶ 25. Furthermore, "[n]o presumption of correctness may be accorded to an assessment that does not apply the principles in the *Property Assessment Manual.*" *Id.*, ¶ 56. Whether a city has erroneously failed to follow statutory requirements in making an assessment is a question of law that we review de novo. *Id.*, ¶ 26.

III

¶ 18. This case requires us to identify the correct methodology for assessing leased retail property for purposes of municipal taxation when the leases for such property contain monthly payments significantly above the market rental rate in part as a result of certain unique business and financing terms being incorporated into the contractual lease terms.

¶ 19. The power to determine the appropriate methodology for valuing property for taxation purposes lies with the legislature. *See* 16 Eugene McQuillan, *The Law of Municipal Corporations* § 44.109 (3d ed., Thomson West 2003). As such, we begin our analysis with a look at the governing statutes, reviewed in conjunction with basic principles of real property assessment as described by case law, treatises, and the *Property Assessment Manual.*

172

## A

██

¶ 20. Wisconsin Stat. § 70.32(1) unambiguously provides that "[r]eal property shall be valued by the assessor in the manner specified in the Wisconsin property assessment manual provided under s. 73.03(2a) from actual view or from the best information that the assessor can practicably obtain, at the full value which could ordinarily be obtained therefor at private sale." The Manual, in turn, provides that "[t]he goal of the assessor is to estimate the market value of a full interest in the property, subject only to governmental restrictions. All the rights, privileges, and benefits of the real estate are included in this value. This is also called the market value of a fee simple interest in the property." *Property Assessment Manual* 7–4. Consequently, a property assessor's task is to identify the market value of a fee simple interest as described by the *Property Assessment Manual,* and which reflects the "full value"[7] that could ordinarily be obtained at a private sale, as described by § 70.32(1). *See id.*

¶ 21. There are three primary methods of property assessment set forth by the *Property Assessment Manual* and generally recognized in real estate ap-

---

[7] This court has explained that "[f]or the purposes of assessing real property, we have construed the statutory phrase 'full value' to mean market value. The terms 'full value,' 'market value' and 'fair market value' are synonymous and interchangeable in the opinions." *Flood v. Bd. of Review,* 153 Wis. 2d 428, 435, 451 N.W.2d 422 (1990)(citing *Darcel Inc. v. Bd. of Review,* 137 Wis. 2d 623, 628, 405 N.W.2d 344 (1987); *State ex rel. Baker Mfg. Co. v. Evansville,* 261 Wis. 599, 608, 53 N.W.2d 795 (1952); *Property Assessment Manual* 7–3). *See also* 16 Eugene McQuillan, *The Law of Municipal Corporations* § 44.109 (3d ed., Thomson West 2003).

praisal law: the sales comparison approach, the cost approach, and the income approach. *Property Assessment Manual* 7–19 to 7–30; *Adams,* 294 Wis. 2d 441, ¶¶ 28–29. *See also The Law of Municipal Corporations* § 44.109 (describing the three methods as methods of determining market value).

¶ 22. The *Property Assessment Manual* describes the sales comparison approach as involving a comparison of properties similar to the subject property and adjustment for differences. *Property Assessment Manual* 7–18, 7–20. The Manual explains that this approach incorporates "the principles of substitution," that buyers will not pay more for property than it would cost them to acquire substitute property of equal desirability and utility. *Id.* at 7–20.

¶ 23. The *Property Assessment Manual* describes the cost approach as also based on the principle of substitution. *Id.* at 7–19, 7–23. Under the cost approach, the Manual prescribes, an assessor adds the estimated land value to the present value of improvements (calculated by subtracting accrued depreciation from the reproduction or replacement "cost new" of the structure) to arrive at a total property value. *Id.*

¶ 24. The *Property Assessment Manual* explains that in leased property scenarios, the income approach is often the most reliable approach for property valuation, describing the income approach as estimating and then capitalizing the net rent a property subject could generate. *Id.* 7–29 to 7–30, 9–11.[8] The specific steps outlined by the Manual for applying the capitalized

---

[8] *The Appraisal of Real Estate* similarly explains that:

In the income capitalization approach, an appraiser analyzes a property's capacity to generate future benefits and capitalizes the income into an indication of present value. The principle of anticipation is fundamental to the approach. Techniques and

income approach include: (1) estimating potential gross income; (2) deducting for vacancy and collection loss; (3) adding miscellaneous income; (4) determining operating expenses; (5) subtracting operating expenses to derive net income; (6) selecting the correct capitalization method; (7) deriving the capitalization rate; and (8) applying the capitalization rate to net income to arrive at a value estimate. *Property Assessment Manual* 9–11. The Manual emphasizes that "[i]n all of these steps the assessor must be aware of what is happening in the market. All of the information needed for the income approach is either obtained or verified by what the assessor finds in the marketplace." *Id.*

¶ 25. The Manual further explains the proper methodology for assessing retail stores specifically:

> The sales comparison approach is often used to value smaller retail stores. Because smaller retail stores may be easily adapted to other retail uses, sales of these stores can be used as comparable sales in applying the sales comparison approach. For the larger stores and those smaller stores for which there are no comparable sales, the assessor should use the income and/or cost approaches.

*Property Assessment Manual* 9–39.[9]

¶ 26. Turning to the income approach dispute in this case, we find particular relevance in the *Property Assessment Manual*'s explanation that "[w]hen applying the income approach, *the assessor must use the market*

---

procedures from this approach are used to analyze comparable sales data and to measure obsolescence in the cost approach.

*The Appraisal of Real Estate* 471.

[9] This passage can also be found at page 9–30 of the 2005 version of the manual. It was not cited by either party or lower court, as none of them considered the cost approach as applicable or helpful as the income approach.

*rent, not the contract rent,* of the property (unless valuing federally subsidized housing . . . [)]. Market rent is the rent that a property would receive based on the current, arm's-length rent commanded by similar properties in the marketplace." *Id.* 7–29 (emphasis added). The Manual adds that "[t]o value the fee simple interest of a property, market rent rather than the actual, or contract rent is to be used in estimating potential gross income." *Id.* 9–12.

¶ 27. The *Property Assessment Manual* does set forth a limited exception to the general rule that income approach valuation of leased property must be based on market rental rates, not the actual contract rents of the subject property. That exception, the Manual explains, corresponds to the relationship between leased fee interest and fee simple interest as determined by comparing contract rents to market rates. "If the contract rents are at market levels," the Manual explains, "the leased fee interest is the same as a fee simple interest. However, if the contract rents are below market levels, the leased fee interest is likely less than the fee simple interest in the property. (See the discussion on partial interests in Chapter 7)." *Id.* The description in Chapter 7 of the Manual of the exception that applies when partial interests result from leases encumbered by below-market rates is perhaps the most pertinent passage of the Manual addressing the subject of the parties' dispute in this case. It provides:

> To accurately estimate the market value of the full interest in leased property, both the lessor's and the lessee's interest (the leased fee and leasehold interest) must be included.
>
> When a property is sold, the leases generally remain intact and must be honored by the new owner. The

terms of any existing leases must be reviewed because they can have a significant effect on the sale price of the property.

The market value of a leased fee interest in a rental property generally depends on how the contract rent relates to the market rent. If the contract rent is at the same level as the market, the leased fee interest has the same value as a full interest (fee simple interest). In this case, the leasehold interest has no value.

A leasehold interest may acquire value if the lease rate is below market. In this case, the leasehold interest has value due to the below market lease. Whenever a leasehold interest has value, the leased fee interest is reduced below that of the market value of a full interest (fee simple interest).

If a property encumbered by leases is sold, only the owner's interest in the property (leased fee interest) is actually transferred. In this case, the assessor must determine if the leasehold interest has any value. If the leasehold interest has value, the value of the leased fee interest is reduced below that of the market value of a full interest (fee simple interest) in the property. The assessor must be aware of the lease terms and structure of any lease-encumbered property sold to determine if the leasehold interest has value.

*Id.* 7–4 to 7–5.

¶ 28. These passages illustrate the appropriate methodology generally used for appraising leased property: an assessor should consider the leased fee interest to be equal to the market value as long as the lease rate is not encumbered to the point of falling below the market rate. In such cases where a lease encumbrance brings the lease rate below the market rate, the assessed value of the property is reduced, corresponding

with the reciprocal positive leasehold value to the tenant. In such cases where the contract rents are below market levels, the leased fee interest, in other words, will not be the same as the fee simple interest in the property. *Property Assessment Manual* 9–12. Because a buyer would not be able to obtain the fair market value at sale in such cases, the *Property Assessment Manual* recognizes that the property should not be valued as if such fair market value were actually obtainable.

¶ 29. The *Property Assessment Manual* does not contain language which similarly requires or allows appraisers to *increase* the market value of the property when the lease rate is *above* the market rate. In such a case, a buyer would still be able to obtain market rental rates, and the lease encumbrance does not therefore bring the property under the exception, which is limited to cases in which the lease rate is below the market rate, making it evident that the market value could not be obtained at sale.

¶ 30. The City argues, and both lower courts agreed, that this clear language in the *Property Assessment Manual* should be disregarded, taking the position that the Manual's methodology violates Wis. Stat. § 70.32(1)'s requirement that property be assessed based on the full value that could be obtained at a private sale. The City describes the Manual as conflicting with the "full value" requirement of Wis. Stat. § 70.32(1) because the City views lease contract values as within the scope of the rights or privileges "appertaining" to real estate described in Wis. Stat. § 70.03's definition of "real property," therefore rendering the contract terms a proper focus in assessing full value.

¶ 31. The City maintains that in conflicts between common law and the Manual, common law

prevails. In this case, the City concludes that such a conflict exists in this case between the *Property Assessment Manual* and *Metropolitan Holding Co. v. Board of Review,* 173 Wis. 2d 626, 495 N.W.2d 314 (1993); *Darcel Inc. v. Board of Review,* 137 Wis. 2d 623, 405 N.W.2d 344 (1987); and *City of West Bend v. Continental IV Fund Limited Partnership,* 193 Wis. 2d 481, 535 N.W.2d (Ct. App. 1995). In regard to *Darcel* and *West Bend* in particular, the City contends that those cases establish that the terms of long-term arms-length leases generally govern property assessments, regardless of whether the lease value is below or above the market value.

¶ 32. Walgreens, in contrast, argues that the City is required by Wisconsin law to base income approach property valuations on market rents, not contract rents, as described by the *Property Assessment Manual* 7–5, 9–12. Walgreens argues that the application of the narrow holdings of *Darcel, Metropolitan Holding,* and *West Bend* to contexts in which the contract rents exceed market rents is improper. Walgreens argues that the holdings of these cases should be read as limited to situations in which a lease or other encumbrance limits a property's value, bringing it below the market value. If this court affirms the lower court decisions and adopts the City's position, Walgreens warns, this state's laws would be in conflict with those of the majority of states that have looked at this issue and held that income approach property assessments must be based on market rates, not contract rates.

¶ 33. Walgreens does not dispute that its above market rate leases can increase the value of its stores to purchasers, but it differentiates between property value and contract value, and contends that the increased value is not a real property value subject to taxation.

179

Walgreens warns of the dangers posed by commingling contract and real property rights, explaining that assessors should not be allowed to ignore their duty to differentiate between the market and other elements of the contract that are not typical of the market. Walgreens argues that the lessor's rights to the above market value in this case are contract rather than real property rights.

¶ 34. We agree with Walgreens that the lower courts in this case erroneously failed to correctly apply the relevant statutory language of Wis. Stat. § 70.32(1) and pertinent provisions of the *Property Assessment Manual,* case law, and persuasive authorities that address the assessment of leased property in consistent terms. We will proceed to address the following interrelated flaws with the approach taken by the City and the lower courts in this case: (1) their erroneous extension of the precedents of *Darcel, Metropolitan Holding,* and *West Bend,* which merely recognize a narrow exception to the general rule of valuing property by market value, an exception applicable only when market value could not be obtained by a purchaser due to encumbrances resulting in lower than market value rent terms; (2) their erroneous failure to properly apply cases that are on point, such as *Flood,* 153 Wis. 2d 428, and *State ex rel. Flint Building Co. v. Board of Review,* 126 Wis. 2d 152, 160–61, 376 N.W.2d 364 (Ct. App. 1985), which address the consideration assessors must pay to unusual financing terms, as distinguished from actual property value; (3) their failure to recognize the rule that it is erroneous to rely solely on the income approach in a property assessment, and that it is also bad policy to do so in the manner the City assessor did in this case, in effect taxing business efforts instead of property.

180

B

¶ 35. The parties debate whether the lower courts improperly failed to apply the proper appraisal methodology set forth by the *Property Assessment Manual.* As we have described, both parties focused on the income approach in their assessments and in their briefing. Consequently, although the Manual describes both the income and cost approaches as being the best methods of assessing large retail property absent comparable property data, we confine the remainder of the analysis to the narrow dispute of the appropriate income approach methodology to be used in this case.

1

¶ 36. Walgreens maintains that the lower courts erroneously failed to apply the *Property Assessment Manual,* which must be followed absent a conflict between the Manual and statutory requirements. The City responds that such a conflict exists, with the Manual contradicting both statutory and case law in Wisconsin. We disagree that there is such a conflict justifying the City assessors' and the lower courts' refusal to follow the Manual's general requirement that market rather than contract rates determine the value of leased properties under the income approach.

¶ 37. The cases upon which the City relies to illustrate such a conflict are those cited in the lower court decisions—*Metropolitan Holding, Darcel,* and *West Bend.* However, each of these cases, unlike the present case, involved properties encumbered by *below* market rent, which is a limited exception to the general rule recognized by the *Property Assessment Manual* 7–4

181

to 7–5, based on a potential purchaser's inability to obtain the market rate value of property due to a lease encumbrance. *See also Property Assessment Manual* 9–12. The common holding of these cases, exempting such properties from the general rule that market rent and not contract rent is the proper measure of leased property value, does not apply to cases involving properties with *above* market rent.

¶ 38. In *Metropolitan Holding,* 173 Wis. 2d at 628–31, this court held that where a federally funded housing complex was encumbered by Department of Housing and Urban Development restrictions, including limits on rent, type of tenants, and net profit per unit, actual rents rather than market rents were the proper measure of an assessment. This case is not on point because it was a public housing case, bringing *Metropolitan Holding* within the ambit of the exception explicitly delineated by the language of the *Property Assessment Manual*'s requirement that assessors must value property based on the market rent rather than the contract rent leased property "unless valuing federally subsidized housing." *Property Assessment Manual* 7–29.

¶ 39. Although *Darcel* and *West Bend* did not involve federal housing, their holdings are also inapplicable to the present case, as they merely reflect the *Property Assessment Manual*'s exception to the general rule of valuing leased property by fair market rates for leases with rent terms *under* the market rate.

¶ 40. In *Darcel,* this court held that because the below-market leases in that case encumbered the mall property, the recent sale price of the mall was the best evidence of its value rather than fair market rents, which were no longer available to purchasers of that property. *Darcel,* 137 Wis. 2d at 635–36. This court

added the explicit disclaimer in *Darcel* that "[w]e do not hold that actual rents will always control an estimate of property value," and issued a narrow ruling that an arms-length sale is a preferred method of assessment and "[i]f an encumbrance on the subject land would equally subject all potential buyers to the same decreased use or rent of the property, and the encumbrance was entered into at arms-length for a fair market price at the time it was entered, it should be considered to lower the full market price of the property." *Id.* at 636, 640. Unlike in *Darcel,* the leases in this case are above, not below, market rent, and the City is not requesting an assessment based on such an arms-length sale, rendering both the holding and the underlying rationale of *Darcel* inapplicable to this case.

¶ 41. The City's reliance on *West Bend* is similarly misplaced. In that case, the court of appeals held that the value of a mall encumbered by leases at below market rent should not be based on market rents. *West Bend,* 193 Wis. 2d at 489. According to the City, the court of appeals in *West Bend* did not determine that the contract rents were below market rents because it was irrelevant to the analysis. Rather, the court in *West Bend* concluded that the controlling factor was "the rental payments agreed upon under the negotiated lease terms." *Id.*

¶ 42. However, the court of appeals in *West Bend* was careful to explain that the lease in that case was to be treated like the leases in *Darcel* and *Metropolitan Holding,* i.e., considered as reflecting the value of the properties more accurately than market rates, because the leases in all three cases functioned as encumbrances which brought the value below the market rate. *West Bend,* 193 Wis. 2d at 488–89 & n.1. The *West Bend* court explained that in *Darcel,* "[i]mportantly, the court

stated that if an encumbrance, such as a long-term lease, would subject all potential buyers to the same *decreased* use or rent of the property and it was entered into at arm's length, it should be considered to lower the full market price of the property." *Id.* at 488–89 (citing *Darcel,* 137 Wis. 2d at 636)(emphasis added). The *West Bend* court was careful to limit its holding to cases involving property *encumbered* by a bundle of rights in the form of a leasehold bringing the market value of the specific property below market rates. *Id.*

¶ 43. There is no language in *West Bend* supporting the circuit court's interpretation of that case as conveying a recognition by the court of appeals "that the Wisconsin Supreme Court has substantially changed the assessment procedure (i.e., from the Wisconsin Property Assessment Manual's procedure) when any sort of encumbrance significantly alters the value of a property." Not only did the court of appeals in *West Bend* not convey such recognition but the circuit court's statement is also a misinterpretation of what this court has held in regard to property assessment involving encumbrances. Although we have certainly ruled that an encumbrance bringing the rent below market value must be treated accordingly, as the *Property Assessment Manual* itself establishes, we have not, as the circuit court describes, held that as a general rule the existence of any encumbrance altering the value of the lease, whether increasing or decreasing it, requires deviating from the assessment procedures set forth in the Manual.

¶ 44. The circuit court's conclusion in this case that the "bundle of rights" referred to in *West Bend* includes inflated rent payments is erroneous. Leases

184

are encumbrances upon a property's bundles of rights, not part of the bundle itself. As the *Property Assessment Manual* explains:

> In Section 70.03, Stats., the definitions of real property includes "all fixtures and rights and privileges appertaining thereto." In essence it is these rights and privileges that the assessor is valuing. These rights are called the *bundle of rights* and consist of use, possession, enjoyment, disposition, exclusion, or the right not to exercise any of these rights.
>
> It is possible to own all or just some of these rights. The extent of ownership of these rights will determine what kind of estate, or interest, one has in the property.
>
> If a person owns all the property rights, they hold a fee simple interest (or estate) in the property. For example, *partial interests (or estates) in real estate can be created by limiting the full bundle of rights through leasing the property. Partial estates include leased fee and leasehold estates.*

*Property Assessment Manual* 7–1 (emphasis added). Furthermore, the Manual explains, "[a] leasehold estate is used to transfer the rights in realty for a limited period of time. Leasehold interest is transferred using a lease for a fixed period in exchange for a payment of rent." *Id.* 7–3.

¶ 45. Rent is not a right in realty; it is what is exchanged for an encumbrance upon a right in realty. As such, a lease is not part of the "bundle of rights" described by *West Bend,* but is rather an encumbrance rendering an estate a "partial estate" due to the fact an owner does not have full access to the property. *See Property Assessment Manual* 7–4, 7–5, 9–12. In cases such as *West Bend,* the lessor is not fully compensated

by the rent terms for the encumbrance a lease creates upon his or her bundle of rights. In contrast, a lessor may be more than fully compensated for an encumbrance through above market rent in cases such as the present one, but that does not transform the lease from an encumbrance to part of the "bundle of rights" appertaining to a property, nor does it transform the rent payments into anything more than compensation for an encumbrance. Rather, it may just make the property owner a wise investor.

¶ 46. The language of *West Bend* is confusing on this point, as *West Bend* appears to consider some lease rights and rental payments to fall within the meaning of "bundle of rights," the court of appeals stating that:

> *Where property is encumbered by a bundle of rights,* we must appraise or assess the property at its value using the current value of those bundle of rights. In this case, we cannot speculate as to what the lease rights might bring on the market, but we must accept the rental payments agreed upon under the negotiated lease terms.
>
> . . . .
>
> In the present case, the full value of the property, including the leasehold, which in this case is treated as an encumbrance on the property, was properly assessed at what could ordinarily be obtained at private sale.

*West Bend*, 193 Wis. 2d at 489 (citations omitted) (emphasis added). Even if we accepted this description of rental payments as being a "bundle of rights" in some cases, however, it is critical to keep in mind that *West Bend* limits such cases to those in which the lease term "bundle of rights" actually encumber the property.

¶ 47. In this case, the above market lease terms enhance, rather than encumber, the worth of a property in the eyes of a potential purchaser. However, just because retail property may be income-producing does not render the contract benefits of an above market lease equal to a higher property value. *The Appraisal of Real Estate* at 473. Even leases with higher lease terms may still result in problems outweighing its benefits to the property owner, such as the risk of weak tenants or even financially capable tenants who are litigious and willing to ignore lease terms or break leases. As such, "[a] lease *never* increases the market value of real property rights to the fee simple estate." *Id.* (emphasis added).

¶ 48. This is a critical point, and one directly responsive to the City's arguments that because leases run with the land, an above market rent necessarily increases property value. The surrounding text of this passage explains:

> Because a leasehold or a leased fee is based upon contract rights, the appraiser needs special training and experience to differentiate between what is generally representative of the market and other elements of a contract that are not typical of the market. An understanding of risks associated with the parties and the lease arrangement is also required. *A lease never increases the market value of real property rights to the fee simple estate.* Any potential value increment in excess of a fee simple estate is attributable to the particular lease contract, and *even though the rights may legally "run with the land," they constitute contract rather than real property rights.* Conversely, detrimental aspects of a lease may result in a situation in which either or both of the parties to the lease, and their corresponding value positions, may be diminished.

*Id.* (emphasis added).

187

¶ 49. The *Property Assessment Manual*'s similar explanations that all the information needed for an income approach assessment can be found in the marketplace, and that the market rate determines an income approach assessment unless an owner could not obtain at least the market rate at a private sale, are consistent with Wis. Stat. § 70.32(1) and with *Darcel, Metropolitan Holding,* and *West Bend.* There is no language in *Darcel, Metropolitan Holding,* and *West Bend* indicating that in addition to there being an exception for below market lease rates to the general rule requiring market rents to guide income approach appraisals, there is a reciprocal exception requiring above market lease rates to be substituted for the market rate as well. To the contrary, as this court explained in *Darcel,* the holding in those cases was narrow, limited by the decision's focus on encumbrances lowering the property value and its express disclaimer that "[w]e do not hold that actual rents will always control an estimate of property value . . . ." *Darcel,* 137 Wis. 2d at 640.

¶ 50. Wisconsin Stat. § 70.32(1) requires that "[r]eal property shall be valued by the assessor in the manner specified in the Wisconsin property assessment manual . . . ." It is true, as the City points out, that *Metropolitan Holding* held that an exception to the general rule requiring compliance with the *Property Assessment Manual* may exist when the method of assessment the Manual suggests would violate § 70.32(1). *Metropolitan Holding,* 173 Wis. 2d at 633. However, there is no such conflict in this case.

¶ 51. The *Property Assessment Manual* describes a main rule requiring income approach evaluations to be based on market, not contract rates, along with an

188

*exception* to that rule for below-market lease contracts. *See Property Assessment Manual* 7–4, 7–5, 9–12. To varying extents and in slightly different contexts (but all involving below-market lease contracts), *Darcel, Metropolitan Holding,* and *West Bend* all illustrate the exception to that main rule, without undermining or conflicting with the main rule itself.

¶ 52. The logic underlying the exception for below market rents is that the limited ability of owners to purchase property at market value in some cases should be accommodated, rather than taxing property at a rate owners cannot afford, because they would not be able to receive the market value-based assessment amount at a sale. *See Metropolitan Holding,* 173 Wis. 2d at 631–32; *West Bend,* 193 Wis. 2d at 486–91. The Walgreens appraisals in this case illustrate additional policies underlying an income approach based on market rent rather than actual income from the Walgreens leases:

> freestanding drug stores are typically developed on a build-to-suit basis between a developer, acting as the landlord, and the planned tenant. In these instances, the developer is responsible to construct the premises to the specifications provided by the tenant. Construction costs often include a higher than average entrepreneurial profit to guarantee against cost overruns and time delays. Subsequently, the rental rate is an amortization over the lease term of the expenses incurred to construct the tenant-specific improvement.
>
> These long-term build-to-suit leases typically do not allocate any marketing or leasing expenses. Also, vacancy rates are likely understated because these single-tenant properties require a longer leasing period to find a suitable tenant. . . . By factoring in these associated costs the resulting rate is most often well above the open market rate commanded by other similar retail properties in the same area.

189

The appraisals conclude: "Similar to a sale-leaseback transaction, a build-to-suit lease is really a financing tool used by companies to keep capital available for other core business purposes. As such, we will estimate a market rent for the subject building rather than rely on the current contract rent."

¶ 53. There is no conflict between Walgreens' appraisals, the relevant statutes and case law, and the *Property Assessment Manual's* text. We agree with Walgreens that the circuit court erred in failing to apply the general rule described in the Manual requiring income approach assessments to base valuations on market rates rather than contract rates, with an exception in cases in which encumbrances lower the property value below market rate.

2

¶ 54. Walgreens further argues that affirming the circuit court's decision could result in impermissible reliance on extrinsic financial arrangements in assessments. Relying on *Flood* and *Flint*, Walgreens argues that artificially increased sales prices caused by unusual financing arrangements may not be used in property assessments. Acknowledging that the facts of *Flood* and *Flint* are distinguishable from those in the present case because of the sales and comparable properties involved in those cases, Walgreens maintains that the underlying principle is the same: a real property assessment should not be based on factors such as unusual financing or above market rent that are not normal conditions of sale reflected in the value of a fee simple property interest.

¶ 55. We agree. In *Flood,* this court held that Wis. Stat. § 70.32(1) "proscribes assessing real property in

excess of market value." *Flood,* 153 Wis. 2d at 431. Although the assessment in that case was based on a sale as opposed to a lease, the terms of the sale in that case, like the terms of the lease in the present case, included financing terms that elevated the price of the property above fair market value. *Id.* at 430–37. This court noted that when basing a valuation on a sale of the subject property, the Manual advises assessors to examine financing terms and to determine whether the sale price accurately reflects the market value of real property. *Id.* at 438–39. This court further noted that its approach was similar with that in *Flint,* where the court of appeals held that in a comparable property assessment, the effect of creative financing arrangements upon the sale price of comparable property must be considered to establish the full value of that property. *Flood,* 153 Wis. 2d at 440 (citing *Flint,* 126 Wis. 2d at 160).

¶ 56. This court deemed it insignificant that *Flood* was a case involving an assessment based on the actual sale of the subject property and *Flint* was a case involving an assessment of comparable sales; either way, such creative financing arrangements must be considered and distinguished from property value through a cash equivalency adjustment. *Flood,* 153 Wis. 2d at 440. *Flood* explained that this approach is consistent with *Darcel* because *Darcel* recognized that assessors must consider all relevant factors when determining full value. *Flood,* 153 Wis. 2d at 440–41. These cases establish that unique financing arrangements are not part of the ordinary conditions in the market establishing "full value" within the meaning of Wis. Stat. § 70.32(1).

¶ 57. Applying the same principles to this case, we conclude that tax assessors must refrain from including creative financing arrangements under a specific

property's lease in their valuations of that property. In establishing that Wis. Stat. § 70.32(1) requires a court to consider whether and how unusual financing affects a property's market value in a sale, the *Flood* decision brought this state in line with other jurisdictions that have held that leases may never be assessed as increasing the fee simple market value of real property. *Flood,* 153 Wis. 2d at 440–42. *See The Appraisal of Real Estate* at 473. *The Appraisal of Real Estate* further explains that a financing lease may not provide a reliable indication of market rent; rents of comparable properties are better indicia "once they have been reduced to the same unit basis applied to the subject property." *Id.* at 500.

¶ 58. The *Property Assessment Manual* explains that "[a]ll of the information needed for the income approach is either obtained or verified by what the assessor finds in the marketplace." *Property Assessment Manual* 9–11. This general rule is consistent with Wis. Stat. § 70.32(1)'s requirement that the full value must be assessed in terms of "ordinary" conditions of sale. The language of Wis. Stat. § 70.32(1)'s requirement that property be assessed at "full value" must be read in the full context of subsection (1), which requires real property to be assessed "in the manner specified in the [Property Assessment Manual] provided under s. 73.03(2a) from actual view or from the best information that the assessor can practicably obtain, at the full value which could *ordinarily* be obtained therefor at private sale" (emphasis added), and in terms of the exception to the general rule for lease fee values below market rates that we have already discussed.

¶ 59. The *Property Assessment Manual* similarly describes market value in terms of the price a property will bring in an open and competitive market under all

conditions requisite to a fair sale, with the buyer and seller acting prudently, knowledgeably, and assuming the price is not affected by "undue stimulus," under conditions including payment for the property "typical of *normal financing and payment arrangements prevalent in the market* for the type of property involved." *Property Assessment Manual* 7–4 (emphasis added).

¶ 60. Thus, the valuation methodology described by the text of Wis. Stat. § 70.32(1) and by the *Property Assessment Manual* alike reflect the objective "ordinary valuation" standard reflected by a market value approach, not a standard that would allow every assessment to fluctuate dramatically depending on unusual financing terms in a lease. Barring other encumbrances bringing a property below the fair market value in a case such as this, it is the market value and not the above market contract rents that must be the value source in income approach real property assessments of leased property.

¶ 61. In this case, a transfer of lease terms that incorporates reimbursement of a developer's costs at an amortized rate over a long period through favorable financing, resulting in above market rent rates, is not an "ordinary" condition of sale, *see* Wis. Stat. § 70.32(1), nor is it reflective of conditions "typical of normal financing and payment arrangements prevalent in the market." *See Property Assessment Manual* 7–4.

¶ 62. Arguing that *Flood* and *Flint* are distinguishable as cases involving sales-based assessments, the City offers that more applicable cases are those in which Wisconsin courts have held that under the income approach, a property's business value or income-producing capacity that is "inextricably intertwined" with the property may be considered among those

"rights and privileges" appertaining to the property under Wis. Stat. § 70.32(1) and consequently assessed as part of its value. *See ABKA Ltd. P'ship v. Bd. of Review,* 231 Wis. 2d 328, 344, 603 N.W.2d 217 (1999); *Waste Mgmt. v. Bd. of Review,* 184 Wis. 2d 541, 563, 516 N.W.2d 695 (1994); *State ex rel. N/S Assocs. v. Bd. of Review,* 164 Wis. 2d 31, 55, 473 N.W.2d 554 (Ct. App. 1991). Specifically, the City argues that because the income approach "necessarily encompasses the question of whether the lease value is inextricabl[y] intertwined with the land," in the present case, because Walgreens' leases run with the land, that lease income is "inextricably intertwined" with the land and is subject to valuation.

¶ 63. The City fails to take into account the specific limitations that this court placed on the "inextricably intertwined" line of cases in *Adams.* In that case, we distinguished and recognized the limitations of *ABKA, Waste Management,* and *N/S Associates:*

> A review of the cases leading up to *ABKA* demonstrates that inclusion of business value in a property assessment should be the exception, not the norm. *See ABKA,* 231 Wis. 2d at 344 (cautioning that for income to be included in an assessment it must be attributable primarily to the nature of the property); *Waste Mgmt.,* 184 Wis. 2d at 565 (inclusion of business value "permissible only in very limited circumstances under § 70.32(1)"). Only business value related "primarily to the nature of" the property may be included; business value attributable to another source must be excluded from real property assessments. *ABKA,* 231 Wis. 2d at 344; *Waste Mgmt.,* 184 Wis. 2d at 566, 570 (requiring income attributable to labor and skill to be factored out).

In *ABKA, Waste Management,* and *N/S Associates,* the courts confronted the question whether business value was attributable primarily to the underlying real estate or to the business skill and acumen of the property owner. In all three cases, the courts determined the value was attributable to the underlying real estate. Integral to the analysis in these cases was the conclusion that the income appertained to the real property under Wis. Stat. § 70.03, and therefore, was a proper element to include in the real estate assessment under Wis. Stat. § 70.32(1). *See ABKA,* 231 Wis. 2d at 344; *N/S Assocs.,* 164 Wis. 2d at 55.

The conclusions in these cases depend upon the definition of real property in Wis. Stat. § 70.03, which includes "all buildings and improvements thereon, and all fixtures and *rights and privileges* appertaining thereto[.]" (Emphasis added.) Thus, in *ABKA* the management income derived from adjacent real estate could be included in the assessment because the physical proximity and interdependency of the real estate meant the income was a privilege appertaining to the subject real estate, rather than the product of the owner's skill and business acumen. Likewise, in *Waste Management,* the right to generate income from the landfill appertained to the nature of the real estate rather than the labor and skill of the owner. Finally, in *N/S Associates* the right to receive rental income appertained to the nature and location of the mall rather than to the unique qualities of the mall's ownership.

*Adams,* 294 Wis. 2d 441, ¶¶ 80–82. This "inextricably intertwined" question is not, as the City describes, a necessary question under the income approach, but is rather a narrow exception to the general rule that business value should not be included in real estate assessments. *Id.,* ¶ 80; *Waste Mgmt.,* 184 Wis. 2d at 565. Furthermore, the City has not established, as required for the "inextricably intertwined" principle to

apply, that all of the value it assigned to Walgreens' retail properties related "primarily to the nature of" the real property itself, as opposed to being attributable to the labor, skill, or business acumen of the developer, Walgreens, or other factors. *Adams,* 294 Wis. 2d 441, ¶¶ 80–82. Additionally, because of the general rule requiring strict construction of taxation statutes, statutory language authorizing the taxation of real property does not consequently extend to authorize taxation of other subjects, such as privileges. *The Law of Municipal Corporations* § 44.41.10.

¶ 64. As the City itself has frequently emphasized in this case, "an assessor must have the ability to discount, even disregard, factors that do not really bear on the value of a property." *Adams,* 294 Wis. 2d 441, ¶ 53. In cases involving lease terms that reflect not just property value but also unusual financing and business arrangements that do not really bear on the value of the property, therefore, *Adams* is in accord with *Flood* and *Flint* in requiring assessors to disregard such factors, which should not be considered "inextricably intertwined" with the land.

¶ 65. If we were to expand the law in the direction the City requests, property assessments would in essence become business value assessments, with assessors improperly equating financial arrangements with property value. This is in contravention of the general principle that real property assessments should not be based on business value. *Waste Mgmt.,* 184 Wis. 2d at 565. Rather, the valuation of the fair market value of property for purposes of property taxes is by its nature different from business, or income tax assessment.

"[A]n assessor's task is to value the real estate, not the business concern which may be using the property." *Id.*

¶ 66. Here, Walgreens' leases contain contract rights that are not inextricably intertwined with the bundle of property rights ordinarily considered at a property sale. Such contract rights—including compensation to the developer for all such financing, land acquisition, construction, development and financing costs, together with a profit margin—are not directly reflective of property value (although confusingly labeled "rent") and are severable from the rights or privileges "appertaining" to real estate as described in Wis. Stat. § 70.03's definition of "real property."[10] *See*

---

[10] In this case, Walgreens' appraiser provided evidence the circuit court could have considered in an analysis isolating the lease terms corresponding with market value from the creative business and financing terms. For example, Trial Exhibit No. 5, labeled "rent analysis," itemized the source of estimated values or costs corresponding with rent payments. Such items included costs of the developer, including the cost of purchasing the land, a building cost, site improvement costs, architectural and engineering fees, legal fees, loans and other miscellaneous fees, and interim financing. Walgreens' representative, John Murphy, testified that it is the developer, not Walgreens, who finances the demolition, development and construction of Walgreens' stores, with Walgreens reimbursing the developer for such financing as part of its lease terms. In addition, the *Property Assessment Manual,* provides forms for commercial landlords and tenants to itemize property expenses either incorporated by lease terms or extrinsic to the lease, such as a supplemental lease questionnaire that asks what the lease covers and provides opportunities for the lessor or lessee to elaborate what part of the lease terms correspond with something other than "land" or "land and building" and to list other expenses incorporated by the lease terms. *Property Assessment Manual* ch. 9 forms 1–3. However, the need to analyze such factors in the Walgreens' leases is not the same in this case as in *Flood* and *State ex rel.*

*Adams,* 294 Wis. 2d 441, ¶¶ 80–82; *Flood,* 153 Wis. 2d at 440–42, *Flint,* 126 Wis. 2d at 160–61.

¶ 67. Walgreen's appraiser, S. Steven Vitale, testified that his income approach methodology involved reviewing and analyzing comparable retail rentals to determine the market rent for Walgreens' properties.[11] Vitale further testified that the appraisals were conducted according to the language of the *Property Assessment Manual,* which requires that "[w]hen applying the income approach, the assessor must use the market rent, not the contract rent, of the property" and "[t]o value the fee simple interest of a property, market rent rather than the actual or contract rent is to be used in estimating potential gross income." *Property Assessment Manual* 7–29, 9–12.

¶ 68. When asked to account for the difference between the high leased fee value assessed by the City and the lower fee simple value in his assessment, Vitale

---

*Flint Building Co. v. Board of Review,* 126 Wis. 2d 152, 376 N.W.2d 364 (Ct. App. 1985), in that "[a]ll of the information needed for the income approach is either obtained or verified by what the assessor finds in the marketplace." *Property Assessment Manual* 9–11.

[11] Vitale also explained that his assessments subtracted from the effective gross income of the properties' operating expenses, including in a "Stabilized Operating Statement" a market-derived vacancy and collection loss factor, operating expenses, administrative, legal, and accounting expenses, and replacement costs, to arrive at a net operating income. Vitale then applied a direct capitalization method, which he described as "dividing the projected net operating income by an overall rate of return to arrive at a market value indication via the income approach," with the Walgreens properties' capitalization rate derived by dividing the net income of the property, described above, by the sales price. Vitale explained that with fluctuations in the market, capitalization rates will fluctuate as well.

explained that the City may have accurately measured what a property would sell for, but that his calculation was of the fee simple value of the property, which is necessarily lower than what it sells for because the total value of a Walgreens property is a hybrid of an investment commodity and a fee simple property. Vitale described a Walgreens lease as analogous to a corporate bond with real estate behind it, explaining that the real estate fee simple value itself is consequently less than what a Walgreens property sells for with all the rental income included. The circuit court accepted Vitale's findings as credible and "presented in a clear and carefully documented manner," with his testimony and reports "suggest[ing] attention to detail and reasoned conclusions."

¶ 69. In addition to the specific evidence in the record that could assist the court in establishing the market value of Walgreens' properties, there is abundant guidance in the *Property Assessment Manual* and in *The Appraisal of Real Estate,* which are replete with reminders that what really matters in income approach evaluation is the fair market rent, not the particular terms of the subject lease. *The Appraisal of Real Estate* additionally provides specific guidance in how to assess market rent, with the actual lease contract not being the determinative factor, emphasizing instead that "[w]hen sufficient, closely comparable rental data is not available, the appraiser should include other data, preferably data that can be adjusted. If an appraiser uses proper judgment in making adjustments, a reasonably clear pattern of market rents should emerge." *Id.* at 501.

¶ 70. It is uncontested that the inclusion of an amortized reimbursement of the developers' costs into the lease terms in this case resulted in higher than

market rate rental payments, with the circuit court recognizing such "higher than normal" rents as being related to "the developer . . . recovering his development costs on a building that contains the superadequacies demanded by Walgreen." This acknowledgment indicates that the court recognized that the market rate is both ascertainable and that development costs are severable from the lease terms that correspond with property values.

¶ 71. Without commenting on the weight of any evidence offered, we further observe that Walgreens provided evidence of assessable fair market value by describing comparable rents. The list of comparable rentals provided by Walgreens' appraiser included multi-tenant and single tenant commercial properties ranging from around $9 to $17 on a triple net basis; the appraiser also provided testimony describing those comparable retail rentals.

¶ 72. With such guidance and information available for a market-based income approach assessment, there is no need to rely solely on Walgreens' actual lease terms, let alone legal authority to do so. By appearing to rely solely on income stream as equating to property value, the City appears to be in contravention of this court's admonishment in *Adams* that assessors should not rely solely on the income approach to assessment. In *Adams*, this court stated:

> In this case, we think that we would nullify the so-called *Bischoff* rule if we permitted the City assessor to reject all approaches and factors other than an income approach. We think it extraordinary that the assessor rejected out of hand such factors as cost, depreciation, replacement value, and insurance carried.

*Adams*, 294 Wis. 2d 441, ¶ 55. The *Bischoff* rule, in turn, provides that "an assessment with respect to real estate should not be based on income alone." *Bischoff v. City of Appleton*, 81 Wis. 2d 612, 619, 260 N.W.2d 773 (1978). *See also Waste Mgmt.*, 184 Wis. 2d at 558; *State ex rel. IBM Corp. v. Bd. of Review*, 231 Wis. 303, 312, 285 N.W. 784 (1939).

¶ 73. These cases are consistent with the admonitions in the *Property Assessment Manual* that the income approach (or, alternatively, the cost approach) should only be favored over the sales comparison approach if there is no available data of comparable properties. *Property Assessment Manual* 7–18, 9–38. *See also The Appraisal of Real Estate* 83–84. The City's approach, focusing on contract rent rather than market rent, not only contravenes the methodology of the Manual, but it conflicts with a case relied upon by the City, *Darcel*. In *Darcel*, this court explained that "[w]hen an assessor is assessing the value of leaseholds, he is not justified in simply comparing the 'bottom line,' that is, what is the rent charged on the leases. If the assessor wishes to establish comparable leaseholds, he must examine other elements about the lease . . . ." *Darcel*, 137 Wis. 2d at 634.

¶ 74. Basing an assessment solely on the income stream derived from a lease leads to an absurd result of necessarily rendering property that is not income producing "practically valueless for taxation purposes." *Bischoff*, 81 Wis. 2d at 619 n. 6 (citation omitted). As such, if a business goes bankrupt and breaks the lease on a retail property, the value of the property would default to zero under such an approach. In addition, if property is assessed solely by the terms of a long-term lease, the value of the property would remain stagnant

for long stretches of time, regardless of changing property values in the surrounding community. Furthermore, basing assessments broadly on actual lease rates rather than fair market value would result in extreme disparities and variations in assessments.

¶ 75. Finally, it is not clear that the City even followed the income approach methodology it claims to prefer. For example, the City's appraisal report for the 3710 East Washington property described the "current assessment" value of that property as $4,268,500 as of January 1, 2003. The same report states that it applies the income approach because although "[t]here is a recent sale of the subject property. . . [t]his sale should not be used as the only indicator of value for the subject property." However, the appraisal report submitted by the City at trial appears to contradict this statement, with the 2003 current assessment value of $4,268,500 happening to be *exactly* the same amount for which that property sold in 1999.

## IV

¶ 76. Finally, we address the circuit court's dismissal of Walgreens' claims regarding the City's 2004 property valuation based on what it described as Walgreens' failure to provide the Board of Review with statutorily required evidence under Wis. Stat. § 70.47. The dismissal essentially granted the following affirmative defense raised by the City in its answer:

> Plaintiff's Claims for Excessive Assessment are barred by Plaintiff's failure to comply with the procedures for objecting to assessments under Section 70.47, Wis. Stats. Plaintiff failed to specify the information used by Plaintiff to arrive at Plaintiff's estimate of fair market

value for the two subject properties as required under Section 70.47(7)(a) and (ae), Wis. Stats.

¶ 77. In its decision, the circuit court quoted the following provisions of Wis. Stat. § 70.47(7)(a) and (ae), adding the emphasis indicated in subsection (ae):

> (a) . . . No person shall be allowed in any action or proceedings to question the amount or valuation of property unless such written objection has been filed and such person in good faith presented evidence to such board in support of such objections and made full disclosure before said board, under oath of all of that person's property liable to assessment in such district and the value thereof. . . .
>
> . . . .
>
> (ae) When appearing before the board, the person shall specify, in writing, the person's estimate of the value of the land and of the improvements that are the subject of the person's objection and *specify the information that the person used to arrive at that estimate.*

(Emphasis added by circuit court.) The court's decision indicated that it considered the information Walgreens provided at the Board hearing overly conclusory and lacking in sufficient data that could constitute relevant evidence, in contrast with the carefully documented and detailed information Walgreens presented to the circuit court.

¶ 78. Walgreens argues that it presented suffi-cient evidence to satisfy Wis. Stat. § 70.47(7), with a Walgreens representative providing through his testi-mony a good faith opinion of the Walgreens properties' value. In the alternative, Walgreens argues that the City waived this issue. In support, Walgreens cites a court of appeals decision holding in part that by con-ducting a hearing, accepting assessment evidence, and

rendering a decision, a board of review waives its right to object to a taxpayer's failure to comply with § 70.47(7). *Fee v. Bd. of Review,* 2003 WI App 17, ¶¶ 8–10, 259 Wis. 2d 868, 657 N.W.2d 112. Walgreens argues that *Fee* applies in this case because the Board accepted its evidence related to the assessment without objection or motion to dismiss from the City.

¶ 79. In response, the City argues that the Board could not waive the requirement of a full proceeding to hear the evidence because it could not determine the sufficiency of the presentation until Walgreens tried to make its case, and there is nothing legally requiring a municipality to make such an objection before the Board. However, in what is in effect itself another type of waiver, the City also argues that the issue regarding sufficiency of the evidence to the Board is moot and there is no need to address it.

¶ 80. We agree with Walgreens that *Fee* applies to this case; the City makes no effort whatsoever to distinguish the case or address any flaws of *Fee's* analysis. We also agree with the City that this issue is moot.

¶ 81. In this case, as in any property assessment challenge, we review de novo the legal determinations of the circuit court, not of the Board of Review. *See Adams,* 294 Wis. 2d 441, ¶ 24. As the circuit court acknowledged, "[t]he general standards governing this action are not difficult to state. A Wis. Stat. § 74.37(3)(d) action is essentially de novo, i.e., the Court may take evidence not presented to the Board of Review and rely upon such evidence in determining the proper valuation of a property." Even more pertinently, the circuit court recognized that, under *Nankin,* 245 Wis. 2d 86, ¶¶ 24–25, a court makes its determination without regard to any determination made by the Board of Review. Under *Fee,* any noncompliance with

Wis. Stat. § 70.47 by Walgreens became moot when the issue was waived by the Board.

V

¶ 82. In sum, this case is governed by the clear language of Wis. Stat. § 70.32(1) requiring that real property "shall be valued by the assessor in the manner specified in the Wisconsin property assessment manual," and by the similarly clear provisions of the Manual which, in turn, require that "the assessor must use the market rent, not the contract rent," and provide that "[a]ll of the information needed for the income approach is either obtained or verified by what the assessor finds in the marketplace." *Property Assessment Manual* 9–11. The City has failed to demonstrate how this general rule requiring market rent based income approach assessments conflicts with Wis. Stat. § 70.32. The City's citation of cases such as *Darcel, Metropolitan Holding,* and *West Bend,* which do not apply where contract rents exceed market rents, fails to illustrate a conflict between case law interpreting § 70.32 and the Manual, and there is nothing in the text of § 70.32 itself illustrating such a conflict.

¶ 83. The main rule for income approach assessments of leased property is that the property must be assessed in terms of market rents unless, as is the case with encumbrances created by lower than market value rent, a buyer would not be able to buy the property at the market rate. In such cases, the fair market value of the fee simple interest cannot be equated with the leased fee interest. *Property Assessment Manual* 7–4, 7–5, 9–12. *Darcel, Metropolitan Holding,* and *West Bend* are consistent with this rule, recognizing the narrow exception for below-market rents and other encumbrances that bring a leased property's value below the market rate. Such is not the case here.

205

¶ 84. In conclusion, we reaffirm the holding of *Flood,* 153 Wis. 2d at 431, that Wis. Stat. § 70.32(1) "proscribes assessing real property in excess of market value." We recognize that this holding is consistent with the nationally recognized principle of property assessment that "[a] lease never increases the market value of real property rights to the fee simple estate." *The Appraisal of Real Estate* 473. Consequently, it is the Manual's explanation that it is only when contract rents are at market levels that the leased fee interest is the same as a fee simple interest; "[h]owever, if the contract rents are below market levels, the leased fee interest is likely less than the fee simple interest in the property." *Property Assessment Manual* 9–12. In such cases, therefore, the contract rents do determine the fair market value of the fee simple estate.

¶ 85. Wisconsin Stat. § 70.32(1) requires adherence to the *Property Assessment Manual* absent conflicting law. The City assessor in this case improperly failed to apply the provisions of the *Property Assessment Manual* requiring that income approach assessments of the fair market value of a fee simple interest must be based on market rate rents rather than contract rents, absent the existence of an encumbrance bringing the leased fee value below actual market rates. The circuit court and court of appeals similarly erred in failing to apply these well-established rules of property assessment, and in affirming the City's flawed assessment. We reverse the decision of the court of appeals and remand for further proceedings consistent with this opinion.

¶ 86. *By the Court.*—The decision of the court of appeals is reversed, and the cause is remanded to the circuit court for further proceedings consistent with this opinion.

¶ 87. SHIRLEY S. ABRAHAMSON, C.J. (*concurring*). Although the parties' dispute is complex, the dispute hinges upon a simple question regarding the goal of property tax assessments under Wis. Stat. § 70.32(1), namely whether the statute requires an assessor valuing leased real property to estimate the market value of a *fee simple* interest in the leased property, or instead to estimate the market value of a *leased fee* interest in the leased property.

¶ 88. Walgreen Co. states that the court's decision in this case "will establish whether Wisconsin is a fee simple or a leased fee assessment state."[1] The City of Madison (the City) refers to this issue as the "gravamen" of its disagreement with Walgreen Co.[2] The parties' briefs predominantly address this basic point of dispute.[3]

¶ 89. The answer to this question depends on the statutes of the state. In principal, either approach may be used.

---

[1] Walgreen Co.'s Reply Brief and Supplemental Appendix.

[2] City of Madison's Response Brief and Appendix at 13.

[3] *See* Walgreen Co.'s Initial Brief and Appendix at 16–21; City of Madison's Response Brief and Appendix at 6–10; Walgreen Co.'s Reply Brief and Supplemental Appendix at 1–10.

Walgreen Co. states the primary issue presented as follows:

> Whether Wis. Stat. § 70.32(1) required the City [of Madison] to assess the *fee simple* interest of the two Walgreen properties using the income approach based on market rents (as well as other factors) or whether the City could assess the *leased fee* value of the properties considering only an income approach based upon contract rent, not market rents.

Walgreen Co.'s Initial Brief and Appendix at 2 (emphasis added).

The City of Madison states in its brief to this court that it accepts Walgreen Co.'s statement of the issues presented. City of Madison's Response Brief and Appendix at 2.

¶ 90. The majority opinion restates the issue on review as follows: "whether a property tax assessment of retail property leased at above market rent values should be based on market rents (as Walgreen argues) or if such assessments should be based on the above market rent terms of Walgreen's actual leases (as the City argues)."[4] The majority opinion's statement of the issue obscures the parties' basic disagreement about the goal of property tax assessments under Wis. Stat. § 70.32(1).

¶ 91. Nevertheless, the majority opinion answers the question the parties pose. Citing the *Wisconsin Property Assessment Manual,* the majority opinion declares in the very first paragraph of its lengthy analysis that Wis. Stat. § 70.32(1) requires an assessor valuing leased real property to estimate the value of a fee simple interest in the leased property.[5]

¶ 92. After answering the parties' question in a single paragraph, the majority opinion proceeds to explain the means by which the value of a fee simple interest is determined. The parties do not dispute, however, how best to calculate the value of a fee simple interest (or the value of a leased fee interest) in leased real property. Although the parties' assessors employed different assessment techniques in the instant case, this difference is attributable to the parties' disagreement about the basic goal of the assessment—whether the value of a fee simple interest or the value of a leased fee interest in the property should be assessed.

¶ 93. The City does not suggest that Walgreen Co. fails to estimate the value of a fee simple interest in the property when Walgreen Co. uses market rents, and

---

[4] Majority op., ¶ 2.
[5] *Id.,* ¶ 21.

Walgreen Co. does not suggest that the City fails in its stated goal of estimating the value of a leased fee interest in the property when the City uses contract rents. The parties seem to assume, at least for purposes of this appeal, that each arrow strikes the target at which it is aimed.

¶ 94. The court of appeals' decision, the City of Madison's brief, and the brief of the amicus curiae (representing various municipal entities and associations and the Wisconsin Association of Assessing Officers) make the following persuasive argument based on both the accepted definition of fair market value of real property and what happens in the real world: Property is assessed at the amount the property would sell for as a result of arm's-length negotiations in the open market between an owner willing to sell and a buyer willing to buy. A buyer generally would pay more for real property that has a high stream of income from a lease than for property with a lower stream of income from a lease. Because the sum at which a property will be bought and sold is dictated in part by the income from a lease attaching to the property,[6] the actual income stream from the lease should be capitalized to reach the assessed value of the property.

¶ 95. The court of appeals, the City, and the amicus curiae rely on Wis. Stat. § 70.32(1)'s language stating that real property shall be assessed "the full value which could ordinarily be obtained therefor at private sale." They appear to interpret this language as referring to the full price that a lessor-owner of the

---

[6] "When a property is sold, the rights of the tenant are usually not extinguished. The existing leases remain intact and must be honored by the new property owner." Wis. Dep't of Revenue, *Wisconsin Property Assessment Manual* 7–2 (2007) (hereinafter *Manual*).

property could obtain in exchange for the lessor-owner's rights in the property, including the lessor-owner's rights and obligations under a lease running with the land.

¶ 96. The *Wisconsin Property Assessment Manual* supports Walgreen Co.'s position. The *Manual* states that "[t]he goal of the assessor is to estimate the market value of a full interest in the property, subject only to governmental restrictions. . . . This is also called the *market value of a fee simple interest* in the property."[7] The *Manual* apparently is based on the concept that a lease very favorable to the lessor does not increase the fair market value of the real property; any potential increased value in excess of the value of a fee simple interest in the property is attributable to the particular lease and constitutes the value of contract rights rather than real property rights.[8]

¶ 97. I find the City's argument persuasive, but Wis. Stat. § 70.32(1) provides in pertinent part that "[r]eal property shall be valued by the assessor *in the manner specified in the Wisconsin property assessment manual* provided under s. 73.03(2a) from actual view or from the best information that the assessor can practicably obtain, at the full value which could ordinarily be obtained therefor at private sale" (emphasis added). Implicitly, the *Manual* seems to interpret Wis. Stat. § 70.32(1)'s language about "the full value which could ordinarily be obtained therefor at private sale" as referring to the full price that could be obtained for both the lessor's and lessee's real property rights, and not as referring to the price that could be obtained for either

---

[7] *Id.* at 7–4 (emphasis in original).

[8] *See* Appraisal Institute, *The Appraisal of Real Estate* 473 (12th ed. 2001).

the lessor's or lessee's contract rights under a lease agreement. In examining the *Manual,* as the statute instructs, I find that in addition to providing that the assessor must estimate the value of a fee simple interest in the assessed property, the *Manual* expressly contrasts a fee simple interest in real property with "partial interests" such as a (lessor's) leased fee interest or a (lessee's) leasehold interest in the property. According to the *Manual,* "[t]o accurately estimate the market value of the full [*i.e.,* fee simple] interest in leased property, both the lessor's and the lessee's interest (the leased fee and leasehold interest) must be included."[9]

---

[9] *Manual, supra* note 6, at 7–4.

The *Manual* states that "[l]eases create partial property interests known as the leased fee and the leasehold interests. . . . The property owner is said to hold the leased fee interest. The tenant, or lessee, has what is known as the leasehold estate." *Manual, supra* note 6, at 7–2.

*See also The Appraisal of Real Estate, supra* note 8, at 83 (defining a "leased fee" interest in property as "[a]n ownership interest held by a landlord with the rights of use and occupancy transferred by the lease to others" and defining a "leasehold" interest in property as "[t]he interest held by the lessee (the tenant or renter) through a lease transferring the rights of use and occupancy for a stated term under certain conditions").

According to *The Appraisal of Real Estate,* the value of a fee simple interest in leased property may or may not be equivalent to the value of a leased fee interest in the property. *See The Appraisal of Real Estate, supra* note 8, at 82 ("If the rent and/or terms of the lease are favorable to the landlord (lessor), the value of the leased fee interest will usually be greater than the value of the fee simple interest, resulting in a negative leasehold interest. If the rent and/or terms of the lease are favorable to the tenant (or lessee), the value of the leased fee interest will usually be less than the value of the value of the fee simple interest, resulting in a positive leasehold interest.").

211

¶ 98. The court is not bound by the *Manual*. The "common law which accurately reflects the state of the law, and the language of § 70.32(1), STATS., not the [*Manual*], control."[10]

¶ 99. I am not persuaded that the case law contradicts the *Manual*.[11] I therefore join in the mandate. I write separately to explain the rationale of the City's argument and my approach to the instant case.

---

[10] *City of West Bend v. Cont'l IV Fund Ltd. P'ship,* 193 Wis. 2d 481, 487, 535 N.W.2d 24 (Ct. App. 1995). *See also Metro. Holding Co. v. Bd. of Review of Milwaukee,* 173 Wis. 2d 626, 632–33, 495 N.W.2d 314 ("[C]ompliance with the Manual is not a defense when the method of assessment suggested by the Manual results in a violation of sec. 70.32(1), Stats.").

Wisconsin Stat. § 73.03(2a) makes clear that the decisions of the Wisconsin courts are binding upon the Department of Revenue as it prepares and publishes the Manual, not the other way around. Section 73.03(2a) provides in relevant part that the Department of Revenue shall amend its manuals from time to time to reflect, inter alia, "court decisions concerning assessment practices."

[11] Neither of the two principal cases upon which the City and the court of appeals rely addresses the question whether the assessor's task under Wis. Stat. § 70.32(1) is to estimate the market value of a fee simple interest or a leased fee interest in real property. *See Darcel, Inc. v. Manitowoc Bd. of Review,* 137 Wis. 2d 623, 405 N.W.2d 344 (1987); *City of West Bend v. Cont'l IV Fund Ltd. P'ship,* 193 Wis. 2d 481, 535 N.W.2d 24 (Ct. App. 1995).