IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 122,162

In the Matter of the Equalization Appeals of WALMART STORES, INC.; WALMART REAL
ESTATE BUSINESS TRUST; SAM'S REAL ESTATE BUSINESS TRUST; and
TMM ROELAND PARK CENTER, LLC, for the Year 2016 in Johnson County; and
WALMART REAL ESTATE BUSINESS TRUST and SAM'S REAL ESTATE BUSINESS TRUST
for the Year 2017 in Johnson County.

SYLLABUS BY THE COURT

1.

The Board of Tax Appeals is the highest administrative tribunal established by law to determine controversies relating to assessment of property for ad valorem tax purposes.

2.

A property's fair market value determination is generally a question of fact with the fact-finder free to decide whether one appraisal or methodology is more credible than another.

3.

The rule of law established by *In re Prieb Properties, LLC*, 47 Kan. App. 2d 122, 135-36, 275 P.3d 56 (2012), that holds rental rates from commercial build-to-suit leases do not reflect market conditions and may not be relied on by appraisers without adjustments is overruled. *Prieb*'s rationale invades the Board of Tax Appeals' longstanding province as the fact-finder in the statutory process for appraising real property at its fair market value.

Review of the judgment of the Court of Appeals in 61 Kan. App. 2d 154, 500 P.3d 553 (2021). Appeal from the Board of Tax Appeals. Opinion filed July 1, 2022. Judgment of the Court of Appeals

affirming the Board of Tax Appeals is reversed. Decision of the Board of Tax Appeals is reversed, and the case is remanded with directions.

*Ryan L. Carpenter*, assistant county counselor, argued the cause and was on the briefs for appellant Board of County Commissioners of Johnson County.

*Barbara A. Smith*, of Bryan Cave Leighton Paisner LLP, of St. Louis, Missouri, argued the cause, and *Samuel E. Hofmeier*, of the same firm, of Kansas City, Missouri, and *Linda Terrill*, of Property Tax Law Group, LLC, of Overland Park, were with her on the briefs for appellees Walmart Stores, Inc., et al.

*David R. Cooper* and *Andrew D. Holder*, of Fisher, Patterson, Sayler & Smith, LLP, of Topeka, were on the brief for amicus curiae Kansas Association of Counties.

*Johnathan Goodyear*, general counsel, and *Gerald N. Capps*, of Wichita, were on the brief for amicus curiae League of Kansas Municipalities.

*R. Scott Beeler* and *Carrie E. Josserand*, of Lathrop GPM LLP, of Overland Park, were on the brief for amicus curiae The Kansas Chamber of Commerce.

*Jarrod C. Kieffer*, of Stinson LLP, of Wichita, was on the brief for amicus curiae Institute for Professionals in Taxation.

*Stephen R. McAllister* and *Betsey L. Lasister*, of Dentons US LLP, of Kansas City, Missouri, were on the brief for amicus curiae Chamber of Commerce of the United States of America.

*S. Lucky DeFries*, of Morris, Laing, Evans, Brock & Kennedy, Chartered, of Topeka, was on the brief for amicus curiae Council on State Taxation.

The opinion of the court was delivered by

BILES, J.: This is an ad valorem property tax appeal for the 2016 and 2017 tax years involving 11 Walmart and Sam's Club "big box" stores in Johnson County that saw

2

their valuations nearly double from 2015. The Board of Tax Appeals concluded the County's valuations were too high because they improperly relied on unadjusted sales and rental income data from other properties subject to build-to-suit leases. The County appealed, but a divided Court of Appeals panel agreed with BOTA. *In re Equalization Appeals of Walmart Stores, Inc*., 61 Kan. App. 2d 154, 500 P.3d 553 (2021). On review, we reverse the panel and return the case to BOTA to reconsider the County's evidence.

This highly contested issue boils down to deciding whether appraisal opinions founded on unadjusted build-to-suit lease data are inadmissible as a matter of law to support valuations used in the process of ad valorem taxation. The alternative is to treat these opinions like other evidence. Here, BOTA dutifully followed a 2012 Court of Appeals decision that crafted this choice as a rule of law to exclude opinions based on this unadjusted data. See *In re Prieb Properties, LLC*, 47 Kan. App. 2d 122, 135-36, 275 P.3d 56 (2012) (holding rental rates from commercial build-to-suit leases "are not reflective of market conditions and may not be utilized for purposes of the income approach or the sales comparison approaches to value for ad valorem tax purposes in Kansas without a disentanglement by adjustments"). Other Court of Appeals panels have taken a similar approach since *Prieb*, although at times they inject some ambiguity into what evidence is admissible. See, e.g., *In re Tax Appeal of Arciterra BP*, No. 121,438, 2021 WL 1228104, at *10 (2021 Kan. App.) (unpublished opinion) ("If, for example, an appraiser can show that a build-to-suit lease was motivated by market terms and can isolate above- or below-market rents to make the necessary adjustments, BOTA could find that a market rent determination is properly supported and based on appropriate, comparable leases."). This court has never considered the question.

We hold *Prieb*'s rationale invades BOTA's longstanding province as the fact-finder in the statutory process for appraising real property at its fair market value for ad valorem tax purposes. See, e.g., *Northern Natural Gas Co. v. Dwyer*, 208 Kan. 337, Syl.

3

¶ 2, 492 P.2d 337 (1971) ("The State Board of Tax Appeals is the highest administrative tribunal established by law to determine controversies relating to assessments of property for ad valorem tax purposes."). A property's fair market value is generally a question of fact with the fact-finder free to decide whether one appraisal or methodology is more credible than another. *City of Mission Hills v. Sexton*, 284 Kan. 414, Syl. ¶ 8, 160 P.3d 812 (2007). *Prieb*'s rule of law effectively prohibits BOTA from considering expert opinions based on unadjusted data, even when the experts argue their methodologies arrive at a fair market value appraisal in conformity with generally accepted procedures and standards as required by state law. See K.S.A. 79-503a. It does this by declaring "build-to-suit lease rental rates are not probative of market conditions." *Prieb*, 47 Kan. App. 2d at 124.

By following *Prieb*, BOTA imposed an exclusionary rule on the County's evidence—rather than simply considering its weight and credibility. BOTA held the Taxpayers' expert valuation "better adhered to the *Prieb* mandate regarding built-to-suit rental rates than the County appraisals." We remand this case to BOTA to reconsider the County's evidence without *Prieb*'s constraints. Though BOTA may reach the same result on remand, that decision must be based on its own determinations of the facts and witness credibility.

FACTUAL AND PROCEDURAL BACKGROUND

Johnson County appraised these 11 Walmart and Sam's Club stores for tax years 2016 and 2017 at nearly double their 2015 tax values. The taxpayers are the Walmart Real Estate Business Trust, Sam's Real Estate Business Trust, and TMM Roeland Park Center, LLC. All stores are owner-occupied except one, which is leased to Walmart by TMM Roeland Park. Taxpayers unsuccessfully sought review at the county level, then

4

appealed to BOTA, which held a 10-day evidentiary hearing. Valuation experts on both sides testified about their preferred methods for valuing these properties.

In finding the properties' values, BOTA adopted "the income approach," in which: (1) market rent is estimated; (2) market vacancy and collection rates are estimated; (3) appropriate, market expenses are deducted to determine the property's net income; and (4) the net income as determined in the previous steps is divided by a capitalization rate to arrive at that income's present worth. The dispute here mostly concerns the information from which the County's experts constructed their valuation estimates. In particular, the parties argue over the relevance of unadjusted sales and rental rates from other "big box" retail properties subject to build-to-suit leases.

To appreciate the legal issue presented and the conflicting valuation approaches, it is necessary first to detail each side's primary valuation evidence. Then, we will discuss the rulings by BOTA and the Court of Appeals panel before deciding the merits.

*The County's case*

Kyle Blanz, the County's BOTA specialist, explained how the County used the Valbridge Property Advisors Big Box Retail Market Study to estimate each store's market rental rate and expenses on a square-footage basis. The rental rates varied from $7.20 to $10 per square foot based on the County's view of each property's investment class; a 4% vacancy and collection loss rate; operating expenses ranging from $.50 to $.70 per square foot depending on investment class; and capitalization rates from 7.5% to 7.75%, also depending on investment class.

Bernie Shaner, an appraiser who co-authored the Valbridge study, explained how he had trouble finding rental data for big box retail stores because they are seldom leased

5

on the open market in the traditional sense of an existing building offered for rent. Instead, these properties are typically leased under build-to-suit arrangements in which the end user finds a location, develops plans, and hires a contractor in exchange for a lease. This meant the data for his Valbridge study was limited to what could be learned from second-generation leases of big-box properties and build-to-suit rents because big-box stores characteristically do not "changeover" often. But, he added, the rental rates for the first- and second-generation properties compared "[r]ather consistently" and that he expected rent for an older second-generation property to be less than for a new property, which is typically subject to a build-to-suit lease. He said that the fact the stores operating under build-to-suit leases are not "turning over" shows those locations remain viable. He also believed build-to-suit tenants have "done their homework" and analyzed each site to confirm the property's highest and best use as a big box retail store. For these reasons, Shaner typically looked for other build-to-suit leases because they dominate this particular lease market. In his opinion, these leases are very relevant for valuation purposes and represent the typical transaction for this property segment.

A second County expert, Peter Korpacz, appraised the six largest properties and presented his work as evidence supporting the County's valuations. He testified he selected his rental and sales comparables by size and trade area data, and adjusted them for size, year built or renovated, tenant quality, and net operating income per square foot. He testified that when valuing big box retail stores, he looked at rentals of other big box retail stores and for sales of properties occupied by the big box retailers. Like Shaner, Korpacz noted retailers "don't sell these first-generation stores . . . until they no longer have value to them . . . ." Accordingly, he said, "we look for sales of properties that have similarities. They are occupied by retailers, and they are always going to be under a lease because those are the ones that sell."

6

In his testimony, Korpacz responded to arguments against using build-to-suit and sale leaseback data for these valuations. He disagreed with those who believe the sales of properties subject to build-to-suit leases values the tenant, not just the real estate. He explained that buyers purchase the fee simple subject to the lease, so they are buying everything including the rent income. He acknowledged that every purchase in which the buyer wants a lease has a credit component, i.e., the tenant's creditworthiness. But he said the reason high-credit tenants are at that site is "because the location brought them there." He added that market participants view the purchase as real estate with rent flow, which the marketplace views as income. He also said when he verified his sales data, the participants said they did not buy intangibles.

Korpacz disputed claims that rents for first-generation build-to-suit leases are based on the cost to build a particular property, and not the market rate for its use. He said a developer analyzes this before going to the marketplace any time a building is built to be leased as income property and tries to negotiate the maximum rent. He believed this is not amortizing construction costs but seeking a rate of return. And he said this is true with every property built to be leased because the property would not be built if the developer cannot see a return on the lease or a profit on the sale.

Korpacz dismissed the critique that rent under a build-to-suit lease is affected by how long a developer wants to wait to be paid back. He testified a developer is kept in check on the rent because the retailer can go to the market and find someone else who wants a normal rate of return over a normal period. For example, he could not imagine any major company willing to pay back the developer's investment in five years on a rental basis. And consistent with this, Shaner testified he would not consider a short, 10-year primary lease without renewals to be a market transaction. Korpacz believed his methodology reflected the normal way real estate development works and was not peculiar to a big box retailer.

7

Finally, Korpacz insisted build-to-suit lease data should not be excluded out of hand. Rather, he said, transactions should be verified with the parties involved. And in his view, if no non-realty components were in the rent, he would consider it to reflect the market. He said he would not discount a lease just because it was a sale-leaseback or build-to-suit. The bottom line, Korpacz testified, was that in his experience and training his methodologies reflected generally accepted appraisal practices.

Robert Marx valued the remaining five properties to support the County's valuations. He also recognized it was hard to find market rent data for big box retail stores because most are owner-occupied or build-to-suit and not built on speculation, unlike industrial office buildings. Part of his analysis was whether retailers were willing to lease previously occupied single-tenant structures. He found that for a good location, there would not be much difference in market rent because a good location will rent for more money. Marx looked for comparable properties with the same highest and best use as the subject properties in economically similar market areas. And for these properties, the highest and best use was as large single-tenant retail discount stores subject to a demand user.

Marx said when performing the income approach, properties are valued as if vacant, ignoring contractual income and assuming market rent, vacancy, expenses, and capitalization rates. He reviewed sales and leases on the national retail market. He defined "market rent" as the rate a willing lessor would accept and a willing lessee would pay, with consideration given to underlying expenses, in a transaction between a knowledgeable landlord and knowledgeable tenant. Marx said a building's design, age, and location are three major factors affecting the rental price. Older buildings and those that are functionally dated or obsolete tend to rent for less, while good buildings tend to

8

rent for more. In addition, a long-term lease affects the rental rate, as longer leases typically have lower rent than short term ones.

Marx said he considered his assignment to be "a big data problem trying to parse out—I'll use the word to disentangle that leased fee from the fee simple. You've got to take the big picture." To do this, he performed what he called a qualitative analysis using trendlines and bracketing to estimate fair market rent. He said the presence of build-to-suit rents put a "huge focus" on that disentanglement and he made significant efforts at disentangling the leased fee from the fee simple. As BOTA described his process, Marx

> "separated the realty and non-realty components utilizing his market rent analysis technique, which involved an examination of each property's highest and best use, a regional rental survey of properties over 100,000 square feet in size, a local discount warehouse stores rental survey, a re-lease of a Home Depot located at 95th and Metcalf, and current rental listings."

Marx then discussed the construction process for big box stores, noting one valuation study concluded they can cost more than $100 per square foot, not including site preparation, land, or entrepreneurial incentive for the builder, with a discount store costing around $80 a foot. In his opinion, it is cheaper to build new than to retrofit and convert an older discount store. And he said by talking with a big-box contractor he learned it is a very active and competitive market for that formula-built real estate. He said big box retailers usually use the same set of engineers and architects, and there are traveling subcontractors that follow the projects, so the actual construction costs are sometimes less than what they would be if a single user wants to build a building.

Based on this, Marx believed reference data for construction costs of big-box retail stores that he reviewed may overstate what is happening, since big box retailers have an

economy of scale that lowers costs. This causes rental rates to be somewhat below market because they are below what would be the cost otherwise. He also believed that, when all the other units of production are in place—land, labor, and capital entrepreneurial incentive—leased fee rents can be below or equal to market rent on build-to-suit properties.

Blanz, Korpacz, and Marx all testified they applied generally accepted appraisal practices in doing their work supporting the County's valuations.

*The Taxpayers' case*

Gerald Maier performed the Taxpayers' appraisals and testified before BOTA. He said the County's higher valuations for 2016 and 2017 resulted from increasing the market rent estimate and decreasing the capitalization rate. Maier compiled cost, sales comparable, and income approaches to valuation, though he deemed the cost approach the least reliable. In his sales comparable analysis, he excluded build-to-suit and sale leaseback sales and excluded sales of second-generation leased properties, focusing solely on sales in which only the real property was transferred. He adjusted the sales for time, market conditions, location, quality, utility, and investment quality to determine a per-square foot value that he applied to the subject properties.

For his income approach, Maier believed second-generation rents were most probative of market value because the tenant entered the property when it was vacant and available for lease, as compared to build-to-suit and second-generation rents involving significant tenant improvements paid for by the property owner. He dismissed build-to-suit leases, which he characterized as financing agreements for the property's construction, so his analysis included some second-generation leases with minimum tenant improvements that he adjusted for. His estimates included a vacancy rate of 7.5%,

which was greater than the County's proposal, because he assumed Walmart would vacate the properties at the time of sale—contrary to other evidence suggesting there would be no vacancy since the store is currently occupied. Expanding on his capitalization rate, Maier explained the subject properties carry risks that do not apply to a property subject to a long-term lease with a creditworthy tenant: the tenant may have poor credit; the property may sit vacant for a period before there is any net income; and property management would be more important. In sum, most of the elements of risk are higher for a "fee simple" situation than for a "leased fee" situation. He estimated a 10% capitalization rate, reflecting costs that the new owner would have to incur to re-lease the property, such as holding cost, tenant finish, and the time and risk associated with re-leasing.

*BOTA's decision*

BOTA adopted the Taxpayers' appraisal approach. It first concluded it needed to determine the fair market value of only the real estate. And to do so, it held valuing the properties as vacant and available to be rented at market rate was supported by substantial competent evidence and complies with the Uniform Standards of Professional Appraisal Practice (USPAP). It decided it was permissible to determine the difference between the property's value under a hypothetical vacant condition and its value as occupied to isolate the taxable real estate's value from the value of the business conducted on it.

BOTA cited *Prieb* for the proposition that build-to-suit rental rates do not derive from the market, and as a matter of law cannot be used to establish a property's income-generating potential without disentanglements and adjustments to show the rent paid is for the real estate alone. It noted K.S.A. 74-2433(a) requires BOTA to "be bound by the doctrine of stare decisis limited to published decisions of an appellate court." And it

11

observed, "We find *Prieb*'s admonition against the use of build-to-suit transactions to be clear and unambiguous."

BOTA then examined the County's evidence and observed its appraisals relied on unadjusted build-to-suit comparables and rental rates contrary to *Prieb*. BOTA concluded that neither the Valbridge study nor Korpacz made the adjustments required by *Prieb*'s rule of law. It also decided Marx's purported adjustments were "lacking and conclusory." It held the Taxpayers' analysis by Maier "better adhered to the *Prieb* mandate regarding build-to-suit rental rates than the County appraisals." And it decided Maier's income approach best reflected the properties' values.

But BOTA also held Maier's 10% and 10.5% capitalization rates were too high. It concluded substantial credible evidence supported an 8.5% rate for all but the Frontage Rd. and Roe Blvd. stores, for which a 9% rate was appropriate. This chart reflects the properties, the County's valuations, the Taxpayers' proposed valuations, and BOTA's valuations:

| BOTA Docket Nos. | Taxpayer | Address | County 2016/ 2017 | Taxpayers 2016/ 2017 | BOTA 2016/ 2017 |
|---|---|---|---|---|---|
| 2016-2700 & 2017-4166 | Walmart Real Estate Business Trust | 5701 Silverheel, Shawnee | $17,751,000 | $8,750,000/ $9,150,00 | $10,153,000/ $10,548,000 |
| 2016-2698 & 2017-4172 | Walmart Real Estate Business Trust | 15700 Metcalf, Overland Park | $18,584,000 | $10,000,000/ $10,500,000 | $11,738,000/ $12,229,000 |
| 2016-2701 & 2017-4171 | Sam's Real Estate Business Trust | 1725 E Santa Fe, Gardner | $15,778,000 | $10,150,000/ $10,650,000 | $11,924,000/ $12,447,000 |

| | | | | | |
|---|---|---|---|---|---|
| 2016-2697 & 2017-4173 | Walmart Real Estate Business Trust | 16100 W 65th, Shawnee | $20,875,000 | $10,150,000/ $10,700,000 | $12,048,000/ $12,603,000 |
| 2016-2699 & 2017-4170 | Walmart Real Estate Business Trust | 395 N K7, Olathe | $21,558,000 | $11,600,000/ $12,150,000 | $13,578,000/ $14,137,000 |
| 2016-2694 & 2017-4169 | Walmart Real Estate Business Trust | 13600 S Alden, Olathe | $16,104,000 | $11,350,000/ $11,900,000 | $13,381,000/ $13,957,000 |
| 2016-2705 | TMM Roeland Park Center, LLC | 5150 Roe Blvd, Roeland Park | $9,264,000 | $5,000,000 | $5,700,000 |
| 2016-2696 & 2017-4167 | Walmart Real Estate Business Trust | 7701 Frontage Rd, Overland Park | $10,947,000 | $5,350,000/ $5,650,000 | $6,409,000/ $6,718,000 |
| 2016-2695 & 2017-4168 | Walmart Real Estate Business Trust | 11701 Metcalf, Overland Park | $13,977,000 | $6,950,000/ $7,300,000 | $8,144,000/ $8,471,000 |
| 2016-2702 & 2017-4175 | Sam's Real Estate Business Trust | 8300 W 135th, Overland Park | $15,648,000 | $8,050,000/ $8,400,000 | $9,356,000/ $9,712,000 |
| 2016-2703 & 2017-4174 | Sam's Real Estate Business Trust | 12200 W 95th, Lenexa | $13,150,000/ $14,756,000 | $6,650,000/ $7,000,000 | $7,838,000/ $8,183,000 |

*The Court of Appeals panel's split decision*

A divided Court of Appeals panel affirmed BOTA's decision. *In re Equalization Appeals of Walmart Stores, Inc*., 61 Kan. App. 2d 154, 168, 500 P.3d 553 (2021). The majority applied *Prieb*'s holding that "build-to-suit leases 'may not be utilized for purposes of the income approach or the sales comparison approaches to value for ad

valorem tax purposes in Kansas without a disentanglement by adjustments . . . .'" 61 Kan. App. 2d at 166.

The *Walmart* majority began by explaining how the County sought to value the "fee simple subject to a lease" to tax both the properties' real estate value and other value created by a contract right, rather than valuing just the fee simple interest. 61 Kan. App. 2d at 164. Next, the majority decided BOTA did not prevent the County from presenting evidence that the unadjusted build-to-suit data reflected market conditions, nor prevent it from presenting evidence of any necessary adjustments. And it held the County "failed to meet its burden of proof because it made the decision to stand on its belief that the rental rates in its build-to-suit lease comparables inherently reflected the actual rental rates in an open and competitive market." 61 Kan. App. 2d at 168.

Addressing the County's bid to overrule *Prieb*, the majority held *Prieb* should be adhered to because it had been "relied on by courts, by BOTA, by attorneys, by appraisers, and by litigants for nearly a decade." 61 Kan. App. 2d at 169. It also reasoned the Legislature acquiesced in *Prieb*'s decision by failing to statutorily respond to it, "confirm[ing] that BOTA is required to decide valuation appeals based "upon a determination of the fair market value of the fee simple of the property." 61 Kan. App. 2d at 169. It also believed "the 2016 amendment to K.S.A. 74-2433 passed by the Kansas Legislature," which specified BOTA must determine the value of the "fee simple" in a tax appeal, suggested *Prieb* accurately reflected legislative intent. 61 Kan. App. 2d at 169-70. Finally, the majority said it was not clearly convinced *Prieb* was wrongly decided or no longer sound because of changing conditions. It observed, "[a]t most, we find that the County has presented an argument in support of its position in the ongoing policy dispute regarding the methodology to use in the appraisal of real property on which big-box retail stores or similar businesses are operated." 61 Kan. App. 2d at 170.

14

Given its rejection of the County's legal attack against *Prieb*, the panel majority held substantial competent evidence supported BOTA's decision because it

> "was based on Maier's valuation opinions that were supported by comparables that reflected market conditions in an open and competitive market. In rendering his opinions regarding valuation of the subject properties, Maier examined sales of nine properties utilized for big-box retail stores. However, he excluded build-to-suit leases and leaseback sales as well as the sales of second generation leased properties. Maier testified that he focused on fee simple sales and adjusted the sale price for time and market conditions, location, quality and utility, and investment quality to derive a square foot unit value that he then applied to each of the subject properties." 61 Kan. App. 2d at 172.

And in holding BOTA's decision reasonable, the majority advanced alternative rationales. It held the County waived any argument that BOTA's decision was unreasonable, arbitrary, or capricious by failing to support it with factual argument or legal authority. It then held that even if the argument was not waived, BOTA adequately explained its decision. Finally, the panel concluded BOTA reasonably adopted Maier's valuations with the adjusted capitalization rates because the County failed to show his "appraisal methodology was inconsistent with Kansas law or the USPAP." 61 Kan. App. 2d at 173.

Judge Steve Leben dissented. He argued for *Prieb* to be overturned and the case remanded to BOTA for full consideration of the County's evidence. He said *Prieb* went outside the bounds of proper judicial review by holding build-to-suit leases generally may not be used in the sales comparison and income approach. He reasoned no statute permitted a reviewing court to determine what was generally accepted appraisal practice. *Walmart*, 61 Kan. App. 2d at 175 (Leben, J., dissenting). And, he noted, *Prieb*'s rejection of the agency fact-finder's acceptance of one expert's valuation over another was highly unusual. He asserted this could not have been done in *Prieb* without first imposing

15

improper legal limits on what could be considered generally accepted appraisal practices to justify excluding some expert testimony. 61 Kan. App. 2d at 175. Judge Leben continued:

> "The essence of *Prieb* is that the leases now in place and generating an income stream for the owner of the buildings housing these big-box stores—leases that may be in place for many years to come—must be ignored altogether. That makes no sense to me either under Kansas law or based on real-estate appraisal principles." 61 Kan. App. 2d at 181.

In support of this, Judge Leben quoted from a concurring opinion in the same Wisconsin case cited by the *Prieb* panel:

> "Property is assessed at the amount the property would sell for as a result of arm's-length negotiations in the open market between an owner willing to sell and a buyer willing to buy. A buyer generally would pay more for real property that has a high stream of income from a lease than for property with a lower stream of income from a lease. Because the sum at which a property will be bought and sold is dictated in part by the income from a lease attaching to the property, the actual income stream from the lease should be capitalized to reach the assessed value of the property." (Emphasis added.) *Walgreen Co. v. Madison*, 311 Wis. 2d 158, 209, 752 N.W.2d 687 (2008) (Abrahamson, C.J., concurring).

Finally, Judge Leben argued stare decisis did not compel continued adherence to *Prieb*. He believed any reliance interest in *Prieb* is not strong, given big-box retailers' sophistication and their awareness that the proper method to appraise their stores is a hotly contested issue. And he pointed out *Prieb* is only an intermediate appellate court decision, so he dismissed any legislative acquiescence argument as weak rationale for reaffirming *Prieb*, as compared to legislative acquiescence in a Supreme Court decision. 61 Kan. App. 2d at 182-83.

16

The County asked for our review of the panel's split decision, which we granted. Jurisdiction is proper. See K.S.A. 20-3018(b) (providing for petitions for review of Court of Appeals decisions); K.S.A. 60-2101(b) (Supreme Court has jurisdiction to review Court of Appeals decisions upon petition for review).

DISCUSSION

As seen from the conflicting views, this case presents two basic alternatives for big box store valuations: continue to consider unadjusted build-to-suit lease data inadequate as a matter of law when it is used to support a valuation opinion; or acknowledge that data's use simply goes to the credibility and persuasive weight of an opinion founded upon it. We consider first *Prieb* and its application to the County's valuations.

*Standard of review*

The Kansas Judicial Review Act controls our review of BOTA decisions. See K.S.A. 74-2426(c). The County, as the party challenging BOTA's decision, carries the burden to show its invalidity. K.S.A. 77-621(a). The KJRA permits judicial relief only for statutorily enumerated reasons, three of which are raised here:

"(4) the agency has erroneously interpreted or applied the law;

. . . .

"(7) the agency action is based on a determination of fact, made or implied by the agency, that is not supported to the appropriate standard of proof by evidence that is substantial when viewed in light of the record as a whole, which includes the agency record for judicial review, supplemented by any additional evidence received by the court under this act; or

17

"(8) the agency action is otherwise unreasonable, arbitrary or capricious." K.S.A. 77-621(c).

A court's review of BOTA's application and interpretation of the law is unlimited and performed without deference to the agency. *In re River Rock Energy*, 313 Kan. 936, 944, 492 P.3d 1157 (2021).

"As to whether BOTA's decision was based on factual determinations unsupported by the record as required for relief under K.S.A. 77-621(c)(7), a reviewing court must determine whether the evidence supporting the agency's factual findings is substantial when considered 'in light of the record as a whole.' K.S.A. 77-621(d) defines substantial evidence '"in light of the record as a whole"' to include evidence both supporting and detracting from an agency's findings. But if BOTA's findings of fact are determined to be so supported, 'the findings cannot be disregarded or contradicted on appeal.' *In re CIG Field Services Co.*, 279 Kan. 857, Syl. ¶ 2, 112 P.3d 138 (2005); see also K.S.A. 77-621(d) ('[T]he court shall not reweigh the evidence or engage in de novo review.').

"Finally, as to whether BOTA's decision was 'otherwise unreasonable, arbitrary or capricious' as required for relief under K.S.A. 77-621(c)(8), we review those questions for abuse of the agency's discretion." *River Rock*, 313 Kan. at 945.

*General statutory background*

The County attacks *Prieb* as judicial overreach unsupported by legal or statutory authority. Taxpayers defend *Prieb* as legally correct and shielded by stare decisis. Our statutes control much of this debate.

State law requires each parcel of real property to be appraised for ad valorem property taxation purposes "at its fair market value in money, the value thereof to be

18

determined by the appraiser from actual view and inspection of the property." K.S.A. 79-501.

"'Fair market value' means the amount in terms of money that a well informed buyer is justified in paying and a well informed seller is justified in accepting for property in an open and competitive market, assuming that the parties are acting without undue compulsion. . . . For the purposes of this definition it will be assumed that consummation of a sale occurs as of January 1." K.S.A. 79-503a.

And when valuing real property,

"Sales in and of themselves shall not be the sole criteria of fair market value but shall be used in connection with cost, income and other factors including but not by way of exclusion:

"(a) The proper classification of lands and improvements;

"(b) the size thereof;

"(c) the effect of location on value;

"(d) depreciation, including physical deterioration or functional, economic or social obsolescence;

"(e) cost of reproduction of improvements;

"(f) productivity taking into account all restrictions imposed by the state or federal government and local governing bodies, including, but not limited to, restrictions on property rented or leased to low income individuals and families as authorized by section 42 of the federal internal revenue code of 1986, as amended;

19

"(g) earning capacity as indicated by lease price, by capitalization of net income or by absorption or sell-out period;

"(h) rental or reasonable rental values or rental values restricted by the state or federal government or local governing bodies, including, but not limited to, restrictions on property rented or leased to low income individuals and families, as authorized by section 42 of the federal internal revenue code of 1986, as amended;

"(i) sale value on open market with due allowance to abnormal inflationary factors influencing such values;

"(j) restrictions or requirements imposed upon the use of real estate by the state or federal government or local governing bodies, including zoning and planning boards or commissions, and including, but not limited to, restrictions or requirements imposed upon the use of real estate rented or leased to low income individuals and families, as authorized by section 42 of the federal internal revenue code of 1986, as amended; and

"(k) comparison with values of other property of known or recognized value. The assessment-sales ratio study shall not be used as an appraisal for appraisal purposes.

"The appraisal process . . . shall conform to generally accepted appraisal procedures and standards which are consistent with the definition of fair market value unless otherwise specified by law." K.S.A. 79-503a.

In addition, the Director of Property Valuation is statutorily required to "adopt appraiser directives prescribing appropriate standards for the performance of appraisals in connection with ad valorem taxation," and those directives "shall require, at minimum . . . [t]hat appraisals be performed in compliance with the uniform standards of professional

20

appraisal practice, commonly referred to as 'USPAP,' promulgated by the appraisal standards board of the appraisal foundation." K.S.A. 79-505.

Finally, K.S.A. 74-2433(g) requires valuation appeals before BOTA must be decided "upon a determination of the fair market value *of the fee simple* of the property." (Emphasis added.)

*Valuing large, big box retail properties under* Prieb

All agree big box retail properties like the ones here present unique appraisal problems. As one commentator noted:

"[O]nly four to five real users of these vacant big-box stores exist: Walmart, Target, Lowe's, Home Depot, and Costco. Because each one of these retailers' use of the actual big-box building is specific to the individual retailer, each prefers to build its own, new store rather than take someone else's box and try to retrofit it for its footprint.

"The build of the physical structure and outward appearance of these national retailers is just as much a part of their identity as the goods they sell. This idea, known as Build-to-Suit, constitutes a construction or alteration of a property to the specifications of the property owner or tenant. These big-box 'properties are never built speculatively and then placed on the market for either sale or rent.' Rather, they are custom built to suit the needs of a particular entity. With every retailer comes a very specific design for their racking and in-store layout." Grant, *Who's Afraid of the Dark?: Shedding Light on the Practicality and Future of the Dark Store Theory in Big-Box Property Taxation*, 38 Va. Tax Rev. 445, 451-52 (2019).

And as a New Jersey Tax Court judge recently observed:

"[I]ssues and pitfalls . . . have plagued the courts in accepting build-to-suit lease agreement[s] as evidence of market or economic rent. Some of those considerations have

included: (i) how the rental rate was arrived at; (ii) whether the property was adequately exposed to the marketplace; (iii) whether the contract rent represents a full or partial repayment of the development and construction costs; (iv) whether the lease terms were comparable to and competitive with other retail leases in the marketplace; and (v) whether the tenant was unusually motivated to enter the marketplace." *W. Orange Twp. v. Westrange LLC CVS*, No. 005443-2015, 2022 WL 682250, at *11 (N.J. Tax Ct. 2022) (unpublished opinion).

*Prieb* represents a judicial attempt to address these concerns by simply announcing a rule of law. In that case, the owner of a 45,000 square foot Best Buy store appealed Shawnee County's valuations for the 2006 and 2007 tax years. Best Buy occupied the building under a build-to-suit lease. In resolving the dispute, BOTA's predecessor, the Court of Tax Appeals,

"took a hybrid approach to the valuation issue, concluding that for 2006 tax year, the Taxpayer's appraisal approach would be endorsed with a replacement of the rental rate of $7 per foot with $8.50 per foot—which was apparently derived from the County's appraisal for 2007—and appeared to be based upon the lease rate for a single property that was subject to a second-generation build-to-suit lease. For the 2007 tax year, COTA embraced the County's appraisal approach and value, even though that approach utilized as comparables three big box properties with first generation tenants." *Prieb*, 47 Kan. App. 2d at 129.

The taxpayer appealed, arguing build-to-suit lease rental rates as a matter of law do not reflect market conditions. The *Prieb* panel generally agreed with the taxpayer and reversed the agency. The panel held "rental rates contained in or reflected by commercial build-to-suit leases are not reflective of market conditions and may not be utilized for purposes of the income approach or the sales comparison approach[] to value for ad valorem tax purposes in Kansas without a disentanglement by adjustments that is beyond the scope of this appeal." 47 Kan. App. 2d at 135-36.

22

To get to its holding, the *Prieb* panel concluded Kansas law requires the "fee simple interest" in real estate to be valued. And it defined this as "'[a]bsolute ownership unencumbered by any other interest or estate, subject only to the limitations imposed by the governmental powers of taxation, eminent domain, police power, and escheat.'" 47 Kan. App. 2d at 130 (quoting The Appraisal of Real Estate, p. 114 [13th ed. 2008]). The panel then distinguished a fee simple interest from a "leased fee estate," which it defined as "a lesser estate in property [that] includes only the landowner's right to receive rents during the term of the lease, plus the value of the reversion upon its expiration." 47 Kan. App. 2d at 132.

Next, the *Prieb* panel held build-to-suit rental rates do not reflect market rent as a matter of law. It took what it characterized as a "common-sense approach to the problem," and reasoned

"such a lease is essentially a financing agreement between a lessor and lessee, and the rental rates therein are based in large part upon the revenue needed to amortize the investment required for the required construction—plus a measure of profit—over the lease term or extensions thereof. Accordingly, when one takes a snapshot view of rental rates at any time during such a lease, these rates are not reflective of market rent, but rather just reflective of the rate required in that specific situation to continue an agreed revenue stream to amortize the lessor's investment, subject to a host of financial risks. In other words, contract rents in a build-to-suit lease are not designed to capture market value for each period within the lease term, but rather are designed to amortize an investment made at the outset and may vary dependent on factors that are unrelated to the real estate market thereafter. Reliable source material is in agreement with this overview." 47 Kan. App. 2d at 132-33.

23

The *Prieb* panel believed its perspective was supported by The Appraisal of Real Estate (13th ed. 2008), which "recognize[d] the essential difference in build-to-suit rental rates and true market rentals." Adding:

> "'Like all contracts, a real estate lease depends on the actual performance of all parties to the contract. A weak tenant with the best of intentions may still be a high risk. The same is true of a financially capable tenant who is litigious and willing to ignore lease terms, break a lease, and defy lawsuits. If the tenant defaults or does not renew a lease, the value of the underlying property does not change, but the value of the leased fee may be seriously affected.

> "'Because a leasehold or a leased fee is based on contract rights, the appraiser needs special training and experience to differentiate between what is generally representative of the market and other elements of a contract that are not typical of the market. An understanding of the risks associated with the parties and the lease arrangement is also required. A lease never increases the market value of real property rights to the fee simple estate. Any potential value increment in excess of a fee simple estate is attributable to the particular lease contract, and even though the rights may legally "run with the land," they constitute contract rather than real estate rights.' (Emphasis added.) The Appraisal of Real Estate, p. 447." *Prieb*, 47 Kan. App. 2d at 133.

The *Prieb* panel also quoted this from an article in The Appraisal Journal:

> "'Direct capitalization seems to be the preferred model to develop an opinion of value for custom commercial properties via the income capitalization approach. To apply this approach properly, support is needed for its three major ingredients: potential gross income, operating expenses, and overall capitalization rate. The same issues arise with its application as with the sales comparison approach when the appraisal problem involves estimating the market value of the fee simple interest of the custom-built property.

24

"'The first step in applying the income capitalization approach is to determine the market rent. In order to properly develop the market rent, sufficient market evidence must be found of the amount that a willing lessee would pay a willing lessor to occupy the space. A search of sources usually available to appraisers (such as CoStar, NNNEx.com, or similar services) will quickly reveal many leases. When these leases are scrutinized, however, it will be apparent that almost every one is a lease to the original tenant based on a rate that was driven by that tenant's custom-construction specifications. As such these lease rents have little in common with the rent a second-generation tenant would be willing to pay for the space. Evidence of this is both obvious and available.

"'For example, when the fast-food franchise Roy Rogers Restaurants closed, many of its stores went to other fast-food franchises or to local restaurants. However, the buyers stripped the restaurants to their shells, removing all evidence of the prior user, and then rebuilt the restaurants to their own prototypical specifications. The buyers clearly did not want—nor were they willing to pay for—the sometimes expensive custom features of the original construction. So, it quickly becomes apparent that what may look like a substantial pool of potential leases that might be used as comparables in an estimate of market rent for the subject is really of no use whatsoever in determining how much a second-generation tenant would be willing to pay in rent for these custom-built properties.'" 47 Kan. App. 2d at 133-34 (quoting Lennhoff, *You Can't Get the Value Right If You Get the Rights Wrong*, The Appraisal Journal 55, 57 [Winter 2009]).

Aligning with these secondary sources, the *Prieb* panel discussed the Wisconsin decision, *Walgreen Co. v. City of Madison*, 311 Wis. 2d 158, 752 N.W.2d 687 (2008), that held a fee simple interest in a property subject to a build-to-suit lease must be valued based on market rents rather than an above-market contract rent specified in the lease. That Wisconsin court explained,

"'[F]reestanding drug stores are typically developed on a build-to-suit basis between a developer, acting as the landlord, and the planned tenant. In these instances, the developer is responsible to construct the premises to the specifications provided by the

25

tenant. Construction costs often include a higher than average entrepreneurial profit to guarantee against cost overruns and time delays. Subsequently, the rental rate is an amortization over the lease term of the expenses incurred to construct the tenant-specific improvement.

"'These long-term build-to-suit leases typically do not allocate any marketing or leasing expenses. Also, vacancy rates are likely understated because these single-tenant properties require a longer leasing period to find a suitable tenant . . . . By factoring in these associated costs the resulting rate is most often well above the open market rate commanded by other similar retail properties in the same area.'

"The appraisals conclude: 'Similar to a sale-leaseback transaction, a build-to-suit lease is really a financing tool used by companies to keep capital available for other core business purposes. As such, we will estimate a market rent for the subject building rather than rely on the current contract rent.'" *Walgreen*, 311 Wis. 2d at 189-90." *Prieb*, 47 Kan. App. 2d at 134-35.

Finally, the *Prieb* panel reasoned,

"with a very few exceptions, it is generally recognized that build-to-suit lease rental rates are not reflective of market conditions. See, e.g., *Grant County Assessor v. Kerasotes*, 955 N.E.2d 876 (Ind. Tax Ct. 2011); *Federated Retail Holdings, Inc. v. County of Ramsey*, Nos. 62-CV-08-5061, CO-07-4069, 2011 WL 3821296 (Minn. Tax Ct. 2011) (unpublished opinion); Shapiro, *Big–Box Retailers Beware How Assessors Overvalue Your Property*, National Real Estate Investor (Sept. 2000) (http://www.aptcnet.com/articles/big_box_ retailers.htm); Lennhoff, *You Can't Get the Value Right If You Get the Rights Wrong*, The Appraisal Journal, pp. 55-60; Lennhoff, *Fee Simple? Hardly*, The Appraisal Journal, pp. 400-02; c.f. *Rhodes v. Hamilton Cty. Bd.*, 117 Ohio St.3d 532, 533-35, 885 N.E.2d 236 (2008); see also *Matter of Eckerd Corporation v. Burin*, 83 A.D.3d 1239, 1241-43, 920 N.Y.S.2d 824 (2011) (finding that the weight of evidence supported appraiser's finding that build-to-suit properties were not truly reflective of market value); *Matter of Rite Aid of New York No. 4928 v. Assessor of*

26

*Town of Colonie*, 58 A.D.3d 963, 964-66, 870 N.Y.S.2d 642 (2009) (finding that the lower court's decision crediting one appraiser who utilized build-to-suit leases went to the weight of the evidence, not its competency, and affirming the lower court's decision)." 47 Kan. App. 2d at 135.

Other Court of Appeals panels have embraced *Prieb* or rejected challenges against its holding. See *In re Walgreen Co*, No. 119,684, 2021 WL 4929099, at *7 (Kan. App. 2021) (unpublished opinion); *In re Equalization Appeal of Kansas CVS Pharmacy,* No. 119,683, 2021 WL 4929096, at *1 (Kan. App. 2021) (unpublished opinion); *In re Tax Appeal of Arciterra BP*, No. 121,438, 2021 WL 1228104, at *9 (Kan. App. 2021) (unpublished opinion); see also *In re Equalization of Target Corporation*, 55 Kan. App. 2d 234, 244, 410 P.3d 939 (2017) (holding County failed to adequately brief argument that BOTA misapplied *Prieb*).

*The fee simple/leased fee red herring*

Taxpayers argue *Prieb* is supported by the statutory requirement that tax value must be based on "the fair market value of the fee simple of the property" and not "fee simple subject to a lease." See K.S.A. 74-2433(g). They suggest the County aims to add value attributable to contract rights the owner of a similar property might hold under a build-to-suit lease, rather than simply valuing their real estate.

This discussion about the definition of fee simple relates mostly to the Taxpayers' evidence implementing the "dark store theory" in their sales-comparable valuations. Under this approach,

"the owners or retailers that occupy these large plots of property consider the recent trend of big-boxes selling for significantly less than the cost of construction as an appropriate set of market data to utilize when attempting to pinpoint their true market value for tax

27

purposes. At the heart of this new strategy is the contention that using vacant properties as comparable sales for the valuation of big-box stores is viable under generally accepted appraisal methods.

"Conversely, the property tax assessing community argues that if the big-box store were owner-occupied at the start of the year, then stores that were closed at the start of the year should not be used as comparable properties to show market value." Grant, *Who's Afraid of the Dark?*, 38 Va. Tax Rev. at 464.

But the parties' dispute here over defining the interest to be valued for ad valorem tax purposes as the "fee simple" or the "fee simple subject to a lease" appears to be largely a red herring. The County's BOTA specialist, Blanz, testified the County used only the cost and income approaches to fix the subject properties' 2016 and 2017 values. And although Korpacz, Marx, and Maier all testified about sales comparison approaches, BOTA disagreed with the Taxpayers' sales comparison valuations because Maier's comparables were "generally much older and situated in less desirable locations than the subject stores." In doing so, BOTA rejected the so-called "dark store" sales comparison method based on the evidence presented, even though the "dark store" theory is reflected in the rents, vacancy and expense, and capitalization rates proposed by the Taxpayers flowing from Maier's premise that the properties should be valued as if vacant and available to be leased.

In any event, our focus here is on *Prieb*'s condemnation of the County's efforts to use unadjusted build-to-suit rents to determine the market rental rate of the subject properties. The Appraisal of Real Estate 471 (15th ed. 2020), recognizes "[t]he remaining term of a lease, the creditworthiness of the tenants, the influence of atypical lease clauses and stipulations, and other factors can affect the value of the sum of the parts, causing the sum to be greater or less than the value of the fee simple, sometimes significantly so." In other words, it acknowledges a particular lease can bring the market value of a property

28

subject to that lease out of line with the real estate's fair market value. And the County concedes this, agreeing that "'a real property assessment should not be based on factors such as unusual financing or above market rent that are not normal conditions of sale reflected in the sale of the fee simple property interest.'"

Similarly, neither party disputes that "earning capacity as indicated by lease price" and "rental or reasonable rental values" are both factors that may be considered when valuing real estate. See K.S.A. 79-503a(g), (h). So while 10 of the 11 properties here are owner-occupied, the possibility of leasing "constitutes—as a purely factual matter—one method of realizing the value of legal ownership of the property." *Meijer Stores Ltd. Partnership v. Franklin Cty. Bd. of Revision*, 122 Ohio St. 3d 447, 452-53, 912 N.E.2d 560 (2009). Before BOTA, of course, both parties put on evidence of the properties' income generating capacity, and the agency based its valuation determination on its view of what that was.

Moreover, Kansas law requires BOTA to value the fee simple interest. See K.S.A. 74-2433(g). And as the USPAP's author, the Appraisal Foundation, explains in The Appraisal of Real Estate:

> "Income-producing real estate is usually leased. Once a lease is created the fee simple estate is split into two partial interests: the landlord's interest (i.e., the leased fee) and the tenant's interest (i.e. the leasehold). The interest to be valued depends on the intended use and intended user of the appraisal. *Federal or state law often requires appraisers to value leased properties as fee simple estates, not leased fee estates, for eminent domain and ad valorem taxation. When the fee simple interest is valued, the presumption is that the property is available to be leased at market rates*. When an appraisal assignment involves the valuation of the fee simple interest in a leased property, the valuation of the entire bundle of rights applies. The value of a leasehold estate may be positive, zero, or negative, depending on the relationship between market rent and

29

contract rent, the remaining term of the lease, and other factors, as explained in Chapter 7. The difference between the market rent and contract rent may be capitalized at an appropriate rate or discounted to present value to produce an indication of the leasehold value, if any, without consideration of the value of the leased fee estate.

"Appraisers should not assume that the sum of the values of the two partial interests equals the value of the fee simple as this is often not the case. In some instances the sum of the values of the partial interests may equal the value of the fee simple, but each partial interest represents a different ownership interest that must be valued on its own merit . . . . This comparison is particularly important when contract benefits or detriments are substantial. Detrimental aspects of a lease may result in a situation in which either or both of the parties to the lease, and their corresponding value positions, may be diminished.

"It is possible that in some cases both the leaseholder and the leased fee owner are at an advantage or disadvantage because of the terms of the lease. In other cases, there may be an apparent advantage of one party over the other when compared with other leases. . . .

"Like all contracts, a real estate lease depends on the actual performance of all parties to the contract. A weak tenant with the best of intentions may still be a high risk to the lessor. The same is true of a financially capable tenant who is litigious and willing to ignore lease terms, break a lease, and defy lawsuits. If the tenant defaults or does not renew a lease, the value of the leased fee may be seriously affected.

"Because a leasehold or leased fee interest is based on contract rights, appraisers differentiate between lease provisions that are generally representative of the market and other elements of a contract that are not typical of the market. An understanding of the risks associated with the parties to the lease and the lease arrangement is also required. *A lease never increases the market value of real property rights to the fee simple. Any potential value increment in excess of a fee simple estate is attributable to the particular lease contract, and even though the rights may legally 'run with the land' they constitute*

*contract rather than real property rights*." (Emphases added.) The Appraisal of Real Estate 415.

And the USPAP Standards Rule 1-4 requires appraisers encountering leased fees to consider the lease terms' effect on value:

"(a) When a sales comparison approach is necessary for credible assignment results, an appraiser must analyze such comparable sales data as are available to indicate a value conclusion;

. . . .

"(c) When an income approach is necessary for credible assignment results, an appraiser must:

(i) analyze such comparable rental data as are available and/or the potential earnings capacity of the property to estimate the gross income potential of the property;

(ii) analyze such comparable operating expense data as are available to estimate the operating expenses of the property;

(iii) analyze such comparable data as are available to estimate rates of capitalization and/or rates of discount; and

(iv) base projections of future rent and/or income potential and expenses on reasonably clear and appropriate evidence.

. . . .

31

"(d) *When developing an opinion of the value of a leased fee estate or a leasehold estate, an appraiser must analyze the effect on value, if any, of the terms and conditions of the lease(s).*" (Emphasis added.) USPAP 2016-17, p. 20.

The point to all this is that deciding whether build-to-suit lease rates reflect market rent—like any rental rate—does not turn on whether the "fee simple" or the "leased fee" is being valued. And while contract rental rates necessarily reflect upon the value of the "leased fee," more analysis is always required when deciding whether that contract rate is the market rate and whether the leased fee reflects the fee simple value. See The Appraisal of Real Estate, 437-38 (non-arm's length transactions often not reliable indicators of market rent; parties may have motives not typical of the market). This is true for any lease, not just sale-leaseback and build-to-suit lease arrangements. As a result, the fee/leased-fee distinction does not compel *Prieb*'s rule of law singling out build-to-suit rental rates as necessarily requiring a "disentanglement by adjustments" before they can be used to support an appraisal.

*Persuasiveness of these appraisals is a credibility question*

The County argues *Prieb* improperly requires BOTA to consider only a single appraisal methodology that rejects build-to-suit rents even if expert witnesses testify there are no rights to disentangle from a build-to-suit lease rate. The Taxpayers respond that *Prieb* and its progeny do not categorically reject or prohibit the use of build-to-suit leases. Instead, their argument continues, these cases simply require any build-to-suit rent comparables be adjusted to reflect market rent so that the resulting value derived from them reflects fair market value. We agree with the County.

In our reading, *Prieb* effectively prohibits BOTA from relying on any expert opinion that build-to-suit rents reflect the market rent for a property unless the expert "adjusted" or "disentangled" the data. As BOTA observed, "In no uncertain terms, *Prieb*

32

instructs that an income approach based on build-to-suit rental rates was improper 'without a disentanglement by adjustments.'" *Prieb*'s dictate makes no allowance for when an expert testifies adjustments are unnecessary under the circumstances. And as argued by the Kansas Association of Counties in its Amicus Brief, this dictate "requires the assumption of a nonmarket hypothetical as the starting point," by skewing appraisers against sale-leaseback and build-to-suit projects that "comprise a majority of the market activity" for these types of properties; and ignores "a majority of the behavior of market participants active in this property use group."

The *Walmart* panel's majority decision illustrates this point well. It suggests *Prieb*'s rule does not apply when "'an appraiser can show that a build-to-suit lease was motivated by market terms and can isolate above- or below-market rents to make the necessary adjustments, [in which case] BOTA could find that a market rent determination is properly supported and based on appropriate, comparable leases.'" *Walmart*, 61 Kan. App. 2d at 168 (quoting *In re Arciterra*, 2021 WL 1228104). As summarized by the *Walmart* majority,

> "[O]ur caselaw simply recognizes that build-to-suit leases do not—in and of themselves—represent actual market conditions. As a result, taxing entities seeking to use the rental rates in build-to-suit leases as part of their valuation process should be prepared to either come forward with evidence to establish that they are equal to actual market rents or show that appropriate adjustments have been made to bring the lease rates in line with the actual conditions in an open and competitive market." *Walmart*, 61 Kan. App. 2d at 168.

But here, qualified experts testified that income-generating property comparable to the subject properties are typically covered by build-to-suit lease agreements, and that the build-to-suit lease data they used were probative of the market rental rate for the subject properties. For example, Shaner testified a property should be valued using its market

33

rent at its highest and best use and assuming it is leased at market terms and market occupancy. And in his view, the terms of a build-to-suit lease reflected the market for big-box retail properties because it is the typical transaction in that property segment. And in supporting the County's appraisals, Korpacz testified rents under build-to-suit leases reflect market rent when the lease rate is for the realty alone. He concluded the cost-plus-return formula for build-to-suit lease rates was indistinguishable from a developer setting rent rates for a building built on speculation. He also testified the developer's need to recoup its expenses and make a profit is the normal way real estate development works and is not peculiar with a big box retailer.

Yet despite this evidence, the panel majority held "the County failed to meet its burden of proof because it made the decision to stand on its belief that the rental rates in its build-to-suit lease comparables inherently reflected the actual rental rates in an open and competitive market." 61 Kan. App. 2d at 168. And so despite the relief valve the panel majority claimed to read into *Prieb*, it still applied *Prieb*'s rule of law to declare inadequate the County's experts' explanations about why appraisals using the build-to-suit comparables were "equal to actual market rents" consistent with generally accepted appraisal practices.

We also find support in statute for a departure from *Prieb*. BOTA is not "bound by technical rules of evidence, but shall give the parties reasonable opportunity to be heard." See K.S.A. 77-524. And under the Kansas Code of Evidence,

> "If scientific, technical or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue, a witness who is qualified as an expert by knowledge, skill, experience, training or education may testify thereto in the form of an opinion or otherwise if: (1) The testimony is based on sufficient facts or data; (2) the testimony is the product of reliable principles and methods; and (3) the witness

34

has reliably applied the principles and methods to the facts of the case." K.S.A. 2021 Supp. 60-456.

There is no question the direct capitalization income approach to valuation is a "reliable principle[ ] and method[ ]" of forming an opinion about property value. So when an expert's opinion is based on "experiential, rather than experimental reliability," the fact-finder is within its discretion to receive it when reasonable minds could differ whether the data relied on was enough to establish an opinion. See *State v. Aguirre*, 313 Kan. 189, 206-07, 485 P.3d 576 (2021). But *Prieb* limits the data an appraiser may employ to form an acceptable opinion, because it sees this disagreement as a legal question, even though both parties' experts testified their methods complied with the USPAP and generally accepted appraisal practice. *Cf. In re Appeal of ANR Pipeline*, 276 Kan. 702, 720-21, 79 P.3d 751 (2003) (upholding BOTA's exclusion of actual earnings beyond valuation date in income approach, when experts who testified in the case and other authorities agreed actual income figures may not be considered).

So based on the record here, there was evidence tending to show reasonable minds can differ on whether the build-to-suit data was enough to support the County's experts' valuation opinions. And that conflict should be resolved by BOTA—the agency statutorily charged with the decision-making.

The Appraisal of Real Estate, 436-38, describes the detail in estimating market rent:

"An investigation of market rent levels starts with the subject property and the property's attributes. . . .

"When a market rent estimate for the subject property is required, comparable rental data is gathered, compared, and adjusted. The parties to each lease should be

35

identified to ensure that those held responsible for rent payments are actually parties to the leases . . . . It is also important to ascertain that the lease represents a freely negotiated, arm's length transaction. A lease that does not meet these criteria—such as a lease between related entities (e.g., the landlord and the tenant have common ownership or common interests)—often does not provide a reliable indication of market rent. Sale-leaseback transactions must be used with caution because the lease is usually negotiated as part of the sale rather than as an independent, market-based lease negotiation. Sale-leasebacks that are negotiated as financing vehicles may reflect motivations of the tenant and landlord that are not typical of the market.

". . . Comparable rents may be adjusted just as the transaction prices of comparable properties are adjusted in the sales comparison approach. Recently executed and pending leases for the subject property may be a good indication of market rent, but lease renewals or extensions negotiated with existing tenants should be analyzed with caution. . . .

"The amount of data needed to support a market rent estimate for a subject property depends on the complexity of the appraisal problem and the availability of directly comparable rentals. When sufficient, closely comparable rental data is not available, an appraiser should include other data, preferably data that can be adjusted. When analyzed properly, a reasonably clear pattern of market rents should emerge."

We also observe that other jurisdictions are split on the utility of using raw build-to-suit lease data in determining value and that contributes to a conclusion BOTA should decide this. For example, in *West Orange* the New Jersey Tax Court—a trial-level tribunal—found an appraiser's income-based valuation for a Walgreen's drug store using build-to-suit leases lacked credibility:

"Without having conferred with any of the lease transaction participants and conducted an in-depth examination and inquiry into the marketing, negotiation, and motivations of the parties in executing the leases, West Orange's expert's conclusion that

36

these five build-to-suit lease agreements reflect market rent lacks credibility. Moreover, West Orange's expert's exclusive reliance on build-to-suit leases, without evidence of other retail pharmacy rents in the marketplace, leaves the court unable to accurately gauge whether the build-to-suit leases represent accurate evidence of market or economic rent in the subject property's competitive market area.

"Accordingly, without credible evidence of economic or market rent, the court accords West Orange's expert's conclusions of value under the income capitalization approach no weight." 2022 WL 682250, at *13.

And at the appellate level, New York courts have approved valuations of big box retail stores based on approaches much like those taken by both parties here. In one instance, the court affirmed a decision that "chose to credit the testimony of the [taxing authority's] expert over that of the [taxpayer]," reasoning that the decision was "a credibility determination." *Rite Aid of New York No. 4928 v. Assessor of Town of Colonie*, 58 A.D.3d 963, 966, 870 N.Y.S.2d 642 (2009); but see *Home Depot U.S.A. Inc. v. Assessor of Town of Queensbury*, 129 A.D.3d 1427, 1429-30, 12 N.Y.S.3d 364 (2015) (affirming fact-finder's decision to adopt taxpayer's valuation). See also *Meijer Stores Ltd. Partnership v. Franklin Cty. Bd. of Revision*, 122 Ohio St. 3d 447, 453, 912 N.E.2d 560 (2009) (approving the use of build-to-suit comparables to determine the value of large, big-box retail stores and adopting a theory of fee simple value in line with the one advanced here by the County); *Rite Aid of Ohio, Inc. v. Washington Cty. Bd. of Revision*, 146 Ohio St. 3d 173, 180, 54 N.E.3d 1177 (2016) (limiting *Meijer* to "special-purpose" cases in which the property's highest and best use is "continued use by the current occupant in its ongoing business").

Even in *Walgreen Co. v. City of Madison*, the case *Prieb* most prominently relied on, the facts were undisputed that the properties were subject to build-to-suit leases under which Walgreens engaged a developer to find and purchase the sites, buy out existing

37

businesses, and develop the property with "'super adequacies' to suit Walgreens' needs," and that the lease payments included compensation to the developer for the land acquisition, construction, development and financing costs, and a profit margin. *Walgreen Co. v. City of Madison*, 311 Wis. 2d 158, 166, 752 N.W.2d 687 (2008). And the parties also did not dispute that including the costs in the lease terms led to higher than market rental rates. So based on that, as well as a provision in a binding state assessment manual requiring assessors to examine financing terms and determine whether sale price accurately reflects market value, the court applied the same principles to hold "tax assessors must refrain from including creative financing arrangements under a specific property's lease in their valuations of that property." 311 Wis. 2d at 191-92.

We conclude from all of this that the weight of authority does not support *Prieb*'s rule of law that "build-to-suit lease rental rates are not probative of market conditions." 47 Kan. App. 2d at 124. "The determination of the fair market value of property—whether real or personal—is generally a question of fact." *Hutson v. Mosier*, 54 Kan. App. 2d 679, Syl. ¶ 8, 401 P.3d 673 (2017). And this court has recognized in the condemnation context that when "an expert utilizes a legally accepted methodology" to determine value,

> "the question as to whether the legally acceptable methodology most appropriately measures fair market value under the facts of the case and any deficiencies in the expert's analysis can be explored through cross-examination. Ultimately, the weight to be given an expert's opinion is left in the hands of the jury. Without question, a factfinder can find one expert opinion more credible than another. It is not this court's duty to pass on the credibility of witnesses, including expert witnesses." *City of Mission Hills v. Sexton*, 284 Kan. 414, 415, 160 P.3d 812 (2007).

BOTA is the highest administrative tribunal established by statute to determine controversies relating to assessments of property for ad valorem tax purposes. *Prieb*'s

rationale invades BOTA's longstanding province as the fact-finder in the statutory process of appraising real property at its fair market value.

*Principles of stare decisis do not bind this court to* Prieb

Stare decisis recognizes that once a point of law has been established by a court, that point of law will generally be followed by the same court and all courts of lower rank in later cases when the same legal issue is raised. *McCullough v. Wilson*, 308 Kan. 1025, 1032, 426 P.3d 494 (2018). This means stare decisis does not bind this court to follow lower court decisions. And even though the Legislature has not acted to reject *Prieb*, we find this an unpersuasive reason to adhere to its rule of law for the reasons described. After all, this court

> "should observe legislative inaction with a gimlet eye. Legislative inaction is not necessarily indicative of legislative intent. See *Board of Leavenworth County Comm'rs. v. McGraw Fertilizer Serv., Inc.*, 261 Kan. 901, 916, 933 P.2d 698 (1997) (the court can draw many contradictory inferences from the legislature's failure to pass a bill); *Higgins v. Cardinal Manufacturing Co.*, 188 Kan. 11, 25, 360 P.2d 456 (1961) (it is 'highly speculative' to conclude legislature's failure to pass a bill on the subject at hand to be indicative of legislative intent; legislature may have considered the legislation unnecessary in light of current state law)." *USD 501 v. Baker*, 269 Kan. 239, 246-47, 6 P.3d 848 (2000).

As Judge Leben's dissent suggests, the ongoing controversy surrounding valuation of big-box retail properties should have cautioned against strong reliance interests being formed based on the *Prieb* panel's decision. See *Suesz v. Med-1 Sols., LLC*, 757 F.3d 636, 649-50 (7th Cir. 2014) ("[A] prior decision of one intermediate appellate court does not create the degree of certainty concerning an issue of federal law that would justify reliance so complete as to justify applying a decision only prospectively in order to protect settled expectations."). This is especially true when, as here, the valuation of these

properties occurs anew every tax year. See K.S.A. 79-503a (property to be appraised at value on January 1 of tax year); K.S.A. 79-1412a *Second* (county appraiser's duty to supervise listing and appraisal of real estate annually as of January 1).

*The County's remaining issues*

In its petition for review, the County broadly asked in the closing paragraph that "the Court grant this Petition for Review for analysis on the issues raised at the Court of Appeals and in this petition for review." But besides the challenge to *Prieb*, those other issues were not addressed more specifically either in the petition for review or the County's Supplemental Brief. We understand those issues to be (1) whether BOTA's decision was supported by substantial competent evidence considering the record as a whole; and (2) whether BOTA's decision was unreasonable, arbitrary, and capricious.

We conclude the County created a preservation and waiver problem by handling these issues as it did. "A party aggrieved by a decision of the Court of Appeals on a particular issue must seek review in order to preserve the matter for Kansas Supreme Court review." *Castleberry v. DeBrot*, 308 Kan. 791, 795, 424 P.3d 495 (2018). In *Castleberry*, the court held a litigant preserved for review only items expressly listed in the petition, even though the litigant wrote through introduction that he "believes all of the issues raised in this appeal should be considered." We explained this introductory phrase was insufficient for the unlisted issues to be "'fairly included' in the petition," so permitting the litigant to raise the issues after the petition was granted "would do a disservice to the other parties who must decide whether to oppose review." 308 Kan. at 796. We hold the County failed to preserve its sufficiency of the evidence and arbitrariness claims by not addressing them more fully in its petition for review or supplemental briefing.

40

Judgment of the Court of Appeals affirming the Board of Tax Appeals is reversed. Decision of the Board of Tax Appeals is reversed, and the case is remanded with directions.